UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CHARLES KEN ZISA,

     Plaintiff,

v.

JOHN HAVILAND,
TIMOTHY CONDON,  ZAIDA MOLINA,
BERGEN COUNTY PROSECUTOR  DETECTIVES
JOHN DOES 1 – 10, LAURA CAMPOS, JOHN
HERRMANN, JOSEPH AL-AYOUBI, ANTHONY
FERRAIOLI, HACKENSACK POLICE OFFICERS
AND EMPLOYEES JOHN DOES 11-20,
ERIC AROSEMOWICZ, BERGEN COUNTY
SHERIFF'S OFFICERS JOHN DOES 21-25,
STEPHEN LO IACONO, TOMAS PADILLA,
POLICE AND OTHER EMPLOYEES OF THE CITY
OF HACKENSACK JOHN DOES 26-30, CITY OF
HACKENSACK, COUNTY OF BERGEN, and THE
BERGEN COUNTY PROSECUTOR'S OFFICE,

     Defendants.

**COMPLAINT**

JURY TRIAL DEMANDED

_____

     CHARLES K. ZISA, by and though his attorneys, McCusker, Anselmi, Rosen & Carvelli,

P.C., by way of Complaint, alleges as follows:

**NATURE OF THE COMPLAINT**

     1.    This is a civil rights action under  42 U.S.C. § 1983  for deprivation of civil

rights protected by the Constitution of the United States, the New Jersey State Constitution, and

related tortious conduct,  arising from the flagrant abuse of power by persons primarily employed

by  the  Bergen  County  Prosecutor's  Office  ("BCPO")  under  Prosecutor  John  Molinelli

("Molinelli"),  and  the  Hackensack  Police  Department  ("HPD"),  together  with  others,  to

maliciously destroy Plaintiff, Charles Ken Zisa ("Zisa"), a long-time Police Chief, for benefit of their own personal agendas.

2.      The allegations arose from an attempted *quid pro quo* demanding Zisa to drop administrative charges against the president of the Hackensack PBA, defendant former HPD Police Officer Anthony Ferraioli ("Ferraioli"), in exchange for keeping false allegations against Zisa out of the media and for not reporting same to law enforcement.

3.      Zisa, then Chief of HPD, flatly rejected this extortion attempt.  Zisa then was falsely accused, arrested, maliciously prosecuted, denied a fair trial, wrongfully convicted, and confined to home for 34 months.

4.      His civil rights were violated by defendants who knowingly conducted a tainted investigation and who denied Zisa a fair trial.

5.      Those defendants, who were and are members of the BCPO, suborned perjury by soliciting and protecting witnesses who were lying about material facts, destroyed exculpatory evidence, and manufactured false evidence to secure an unjust conviction.

6.      Hackensack Police defendants, and a Bergen County Sheriff's Officer, gave life and breath to that false evidence as witnesses against Zisa.

7.      Zisa was indicted for nine felony counts, including four counts of Official Misconduct, two counts of Conspiracy to Commit Official Misconduct, and one count each of a Pattern of Misconduct, Insurance Fraud, and Witness Tampering.  After trial, the jury convicted Zisa of five of the nine counts he was charged with: three counts of Official Misconduct[1], Insurance Fraud, and a Pattern of Misconduct.

8.  The egregious acts by Defendants described below include, *inter alia*, the following:

---

[1] Two of three counts of official misconduct that Zisa was convicted of related to the 2004 Allegations, described below.  One count related to the 2008 Allegations, also described below.

a.  The BCPO lead detective, defendant John "Jay" Haviland ("Haviland"), admitting during cross-examination that he and the BCPO Assistant Prosecutor trying the case, Daniel Keitel ("Keitel"), knew that a key witness, defendant HPD Officer Laura Campos ("Campos")  was lying, but decided not to do anything about it until after Zisa's trial - during which Keitel presented her as a witness and argued that the jury would find its witnesses to be truthful;

b.  Three BCPO detectives testifying that they were directed to destroy evidence by Haviland;

c.  One BCPO detective testifying that he tried to raise the problems with witnesses during the investigation but was told that "it doesn't matter, the Boss [Molinelli] wants him [Zisa] charged;"

d.  Witnesses testifying that they received the equivalent of full transactional immunity without any of the immunity deals being reduced to writing;

e.  Hackensack Police Officers John Herrmann ("Herrmann"), Joseph Al-Ayoubi ("Al-Ayoubi"), Campos, and Bergen County's Sheriff's Officer Eric Arosemowicz ("Arosemowicz") providing false information, thereby assisting co-defendants Haviland, Timothy Condon ("Condon"), and Zaida Molina ("Molina") in manipulating the Grand Jury and subverting discovery and the pre-trial process, including overcoming a critical motion to sever, described below.  Based on information and belief, Haviland, Condon, and Molina knew that the allegations against Zisa were false.

f.  Defendant Al-Ayoubi, the second key witness against Zisa, was on the verge of being terminated from the HPD for testing positive for dangerous and illegal steroids at the

time of Zisa's arrest, but defendants conspired to have those serious charges dismissed, and Al-Ayoubi was restored to full duty, thus protecting him as a witness against Zisa;

g. The third key witness, defendant Herrmann, actually was the arresting officer on a domestic violence dispute across town at the time he alleged to have participated with Al-Ayoubi in regard to Zisa. Herrmann falsified a police department record to insert himself into the case and to substantiate his lie;

h. Criminal complaints were signed by defendant BCPO Detective Molina without probable cause.

9.     The evidence was so scant, and the prosecution's misconduct so significant, that the trial court granted a Judgment Notwithstanding the Verdict ("JNOV") for three of the five convictions, including two counts of Official Misconduct and the Pattern of Official Misconduct.[2]

10.     Zisa was sentenced to 5 years in prison, and was confined to his home on bail for nearly three years with an ankle bracelet monitoring device while his appeal pended.

11.     The Superior Court of New Jersey, Appellate Division affirmed the granting of the JNOV, ordered the entry of a Judgment of Acquittal on the Insurance Fraud count, and reversed and remanded one lone remaining count of Official Misconduct.  The Appellate Division was compelled to conclude its decision by stating, "Lastly, we remind all concerned that 'the primary duty of prosecutor is not to obtain convictions, but to see that justice is done.'"[3]

12.     On remand, the Presiding Judge of the Bergen County Criminal Division, the Honorable Susan J. Steele, P.J.Crim., dismissed the indictment with prejudice, rendering a 110-

---

[2] The JNOV overturned two convictions for official misconduct, one relating to the 2004 Allegations and the other to the 2008 Allegations, as well as the conviction for a Pattern of Misconduct.

[3] State v. Zisa, No. A-0653-12T4, 2015 N.J. Super. Unpub. LEXIS 1842, at *39 (App.Div. July 31, 2015) (quoting State v. Frost, 158 N.J. 76, 83 (1999)), attached hereto as Exhibit A.

page opinion questioning why the case was ever brought in light of the lacking and doubtful evidence from biased witnesses, and calling out the assistant prosecutor, Keitel, for prosecutorial misconduct.   Judge Steele's dismissal with prejudice of the final count was based on the violation of fundamental fairness and double jeopardy principles.

13.     Following the dismissal of the indictment with prejudice, the City of Hackensack entered into a Payment Agreement and Release wherein, as required by statute, Zisa was repaid his back pay relating to his unpaid six-year suspension based on his arrest and now-dismissed indictment.  Notably, the Payment Agreement makes clear that Zisa's suspension was solely based on the allegations in the dismissed indictment, and then states as follows:

> Administrative Charges. Based upon a review of the record, including the Opinion of the Superior Court of New Jersey, Appellate Division, and Docket No. A-0653-12T4, and the Order and Opinion of Hon. Susan J. Steele, P.J.Cr., dated August 23, 2016, the City Manager as the Appropriate Authority has determined that it is in the best interests of the City not to pursue administrative charges against Zisa, and that **to do so would be in bad faith**, the City agrees to dismiss and not pursue any and all disciplinary charges, administrative hearings, open investigations, if any, against Zisa. These charges, if any, shall be withdrawn and dismissed, and closed with prejudice, and all records thereof removed from his official file. Such dismissal is within the scope of the authority of the City Manager, and same is being dismissed pursuant to such authority under NJSA §40:79-1 et seq., specifically because **there is no credible evidence to support them**.

(Emphasis added.)

14.     Defendant Stephen Lo Iacono ("Lo Iacono"), who was then Hackensack City Manager and in charge of discipline of HPD employees, and defendant Acting Officer in Charge Tomas Padilla ("Padilla"), who then was in charge of day to day operations of the HPD, failed to supervise or intervene in the misconduct of the HPD defendants in their charge, thus also permitted and encouraged, through their inaction, the complete destruction of Zisa's constitutional rights.

## JURISDICTION AND VENUE

15.     This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States and in accordance with 42 U.S.C. § 1983.

16.     This Court has supplemental jurisdiction over Plaintiff's New Jersey State Constitution and state law claims pursuant to 28 U.S.C. § 1367.

17.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

18.     To the extent that Title 59 of the New Jersey Statutes imposes jurisdictional requirements, Zisa has complied with all such requirements applicable to his claims.  Zisa timely served the City of Hackensack and the County of Bergen with notices of claims as required by Title 59.

## PARTIES

19.     Zisa is a resident of the State of New Jersey with a place of residence in Hackensack, Bergen County, New Jersey.  He is a former member of the New Jersey State Assembly, and served in the HPD for over 33 years, almost 15 years as Chief of Police.

20.     Defendant Haviland was during all relevant times a Sergeant or a Lieutenant in the BCPO and the lead investigator with respect to the baseless allegations against Zisa.   Haviland also was the Officer in Charge of the Confidential Investigations Unit ("CIU") of the BCPO, which is a unit that reported directly to Molinelli, and investigated alleged corruption.  Upon information and belief, Haviland resides in the State of New Jersey.[4]  At all relevant times, Haviland was acting under color of state law in his capacity as an employee of the BCPO and is being sued in both his official and individual capacities under 42 U.S.C. § 1983.

---

[4] Because the individual defendants are current or former law enforcement officials, their respective states of residence are stated herein rather than their complete home address.

21.     Defendant Molina is and was during all relevant times a Sergeant and Detective in the BCPO and is the individual who, knowing that probable cause did not exist as a basis for a criminal complaint, signed criminal complaints against Zisa causing his arrest.  Her residence, upon information and belief, is in the State of New Jersey.  At all relevant times, Molina was acting under color of state law in her capacity as an employee of the BCPO and is being sued in both her official and individual capacities under 42 U.S.C. § 1983.

22.     Defendant Condon is and was during all relevant times a Lieutenant, later promoted to Captain in the BCPO.  His residence, upon information and belief, is in the State of New Jersey. At all relevant times, Condon was acting under color of state law in his capacity as an employee of the BCPO, and is being sued in both his official and individual capacities under 42 U.S.C. § 1983.

23.     Defendants Bergen County Prosecutor's employees and Detectives John Does 1 – 10 conspired and committed misdeeds as part of the wrongful investigation and prosecution of Zisa. They procured false incriminating statements from witnesses and failed to investigate leads that would have provided exculpatory evidence on behalf of Zisa. Upon information and belief, they destroyed evidence to prevent exculpatory evidence from being uncovered. At all times, they were acting under color of state law in their capacity as employees of the BCPO and are being sued in their official and individual capacities under 42 U.S.C. § 1983.

24.     Defendant Campos was during all relevant times a Police Officer in the HPD.  Her residence, upon information and belief, is in the State of New Jersey.  At all relevant times, Campos was acting under color of state law in her capacity as an employee of the HPD and is being sued in both her official and individual capacities under 42 U.S.C. § 1983.

25.     Defendant Al-Ayoubi, who may recently have changed his surname to Ayoubi, was during all relevant times a Police Officer in the HPD.  His residence, upon information and belief, is in the State of New Jersey.  At all relevant times, Al-Ayoubi was acting under color of state law in his capacity as an employee of the HPD and is being sued in both his official and individual capacities under 42 U.S.C. § 1983.

26.     Defendant Herrmann is and was during all relevant times a Police Officer in the HPD.  His residence, upon information and belief, is in the State of New Jersey.  At all relevant times, Herrmann was acting under color of state law in his capacity as an employee of the HPD and is being sued in both his official and individual capacities under 42 U.S.C. § 1983.

27.     Defendant Ferraioli was during all relevant times a Police Officer in the HPD.  His residence, upon information and belief, is in the State of New Jersey.  At all relevant times, Ferraioli was acting under color of state law in his capacity as an employee of the HPD and is being sued in both his official and individual capacities under 42 U.S.C. § 1983.

28.     Defendants Hackensack Police Officers and employees, John Does 11 – 20, while acting in concert and conspiracy with BCPO detectives, created and procured false incriminating evidence, and concealed exculpatory evidence in connection with the wrongful investigation and prosecution of Zisa.  At all relevant times, they were acting under color of state law as employees of the HPD and are being sued in their official and individual capacities under 42 U.S.C. § 1983.

29.     Defendant Arosemowicz was during all relevant times a Sheriff's Officer for the Bergen County Sheriff's Department.  His residence, upon information and belief, is in the State of New Jersey.   At all relevant times, Arosemowicz was acting under color of state law in his capacity as an employee of the Bergen County Sheriff's Department and is being sued in both his official and personal capacities under 42 U.S.C. § 1983.

30.     Defendants Bergen County Sheriff's Officers John Does 21 – 25, while acting in concert and conspiracy with BCPO detectives and Hackensack Police Officers, created and procured false incriminating evidence, and concealed exculpatory evidence in connection with the wrongful investigation and prosecution of Zisa.  At all relevant times, they were acting under color of state law as employees of the Bergen County Sheriff's Department and are being sued in their official and individual capacities under 42 U.S.C. § 1983.

31.     Defendant Lo Iacono was during all relevant times the City Manager of Hackensack, New Jersey.  His residence, upon information and belief, is in the State of New Jersey. At all relevant times, Lo Iacono was acting under color of state law in his capacity as an employee of the City of Hackensack and is being sued in both his official and individual capacities under 42 U.S.C. § 1983.

32.     Defendant Padilla was during all relevant times designated as Officer in Charge of the HPD (subsequent to the wrongful removal of Zisa from that position upon his arrest).  His residence, upon information and belief, is in the State of New Jersey.  At all relevant times, Padilla was acting under color of state law in his capacity as an employee of the HPD and is being sued in both his official and individual capacities under 42 U.S.C. § 1983.

33.     Defendants City of Hackensack John Does 26 – 30 conspired and committed misdeeds as part of the wrongful investigation and prosecution of Zisa. They procured false incriminating statements from witnesses and failed to investigate leads that would have provided exculpatory evidence on behalf of Zisa. Upon information and belief, they destroyed evidence to prevent exculpatory evidence from being uncovered. At all times, they were acting under color of state law in their capacity as employees of the BCPO and are being sued in their official and individual capacities under 42 U.S.C. § 1983.

34.     Defendant City of Hackensack is a municipality located in the State of New Jersey with municipal offices located at 65 Central Avenue, Hackensack, New Jersey.

35.     Defendant County of Bergen is a municipality located in the State of New Jersey with municipal offices located at 1 Bergen County Plaza, Hackensack, New Jersey.

36.     Defendant Bergen County Prosecutor's Office is a municipal agency located in the State of New Jersey with its principal offices located at 2 Bergen County Plaza, Hackensack, New Jersey.  Defendant Bergen County Prosecutors Office, while acting in concert and conspiracy with BCPO detectives and employees and Hackensack Police Officers, took administrative action to supersede the Hackensack Police Department in order to solicit and protect false testimony, and protect witnesses who were able to then testify falsely against Zisa.

37.     While not named as a defendant, Assistant Prosecutor Keitel was a participant in the conspiracy, and his actions and inactions show that Defendants were fully aware that allegations against Zisa were meritless.  Accordingly, he is referenced throughout this Complaint.

**FACTS**

38.     Zisa began his employment with the HPD as a patrol officer on December 1, 1976.

39.     As of June 1, 1995, Zisa was promoted to Chief of the HPD.  In total, Zisa served the City of Hackensack for over 33 years.   He was suspended from the HPD, without pay, following his arrest in 2010.  The false allegations which lead to his improper arrest are described in detail below.

40.     As a result of his wrongful conviction, in 2012 Zisa forfeited his position and pension.  Zisa also endured nearly three years – from September 21, 2012 through July 31, 2015 – confined to his home with ankle bracelet monitoring, until the last of the baseless charges against

him was overturned.  The last remaining count against him was dismissed with prejudice on August 23, 2016.

41.     During the time Zisa was under indictment, he lost both of his parents, with his indictment being mentioned in his mother's obituary.  His two adult children were married during his home confinement, and did not have receptions because their father could not attend.  Zisa had to borrow money from his family and friends to avoid losing his house.  He lost his life's savings, nearly every asset but for his house, and narrowly avoided bankruptcy.

42.     The emotional distress Zisa endured was debilitating.

43.     Zisa's reputation has been devastated.

44.     Despite the eventual acquittals and dismissal of all charges against Zisa, as well as the fact that his employment has been restored and he is on administrative leave, as recently as May 2017, the Mayor of the City of Hackensack publicly referred to Zisa as a criminal, and as the "disgraced police chief."

**1.      The Creation of False Allegations Against Zisa by Several Police Officers Facing Administrative Charges in an Attempt to Force Zisa to Dismiss Those Charges**

45.     Zisa was known to be a strict Police Chief.  In the course of his duties as Chief, Zisa pursued administrative disciplinary charges against several members of the HPD.

46.     In 2009, Zisa administratively charged Ferraioli with impersonating a superior officer and lying during an administrative investigation.  At the time these charges were levied, Ferraioli also was the head of the HPD PBA.

47.     Also in 2009, after Al-Ayoubi failed a drug test by testing positive for an illegal steroid/controlled substance, Zisa administratively charged Al-Ayoubi with using illegal drugs.

48.     In approximately the same time frame, Zisa administratively charged Herrmann with causing damage to a police vehicle.

49.     Both Ferraioli and Al-Ayoubi were facing termination as a result of the administrative charges pending against them.

50.     On January 14, 2010, during a break in Ferraioli's administrative hearing, Ferraioli's attorney, Attorney T[5] – who also represented Al-Ayoubi and Herrmann – attempted to force Zisa to drop the pending administrative charges.  Specifically, Attorney T advised that there were officers who were ready to testify that Zisa had made them falsify a report regarding an event which had occurred in 2008 (the "2008 Car Accident," addressed more fully below).  Attorney T proffered that if Zisa would agree to dismiss the administrative charges, then they would ensure that their allegations concerning Zisa would not be brought up in Ferraioli's hearing, and would not be communicated to the press, or to any other federal, state, or county law enforcement agency.

51.     Zisa, confident he had done nothing wrong, declined the attempted extortion, and directed that the hearing against Ferraioli go forward.  Zisa further requested that Counsel for the City of Hackensack notify the then Bergen County Prosecutor, Molinelli, of the allegation levied against him as well as the offered *quid pro quo*.  Zisa and Attorney T were copied on the resultant January 20, 2010 letter to Molinelli.

52.     On February 8, 2010, in apparent response to that letter, Attorney T sent a letter to Molinelli offering to provide information regarding Zisa and the 2008 Car Accident.  In that letter, Attorney T stated:

> During the course of my representation of Officer Anthony Ferraioli in an entailed administrative hearing (still ongoing), certain actions of the Chief of Police there in Hackensack have come to our attention, which actions may/could in fact be in

---

[5] As this Complaint describes behavior that could constitute an ethical violation, and as such investigations are confidential, this attorney is referenced by the initial of his surname.  It is believed that all defendants know the identity of Attorney T.

violation of N.J.S.A. 2C:30-2.  Officer Ferraioli, as well as the above two officers [referencing the subject line:  Hackensack Police Officers Joseph Al-Ayoubi and John Herrmann], would like to speak to you and/or any assistant prosecutor or investigator you may deem appropriate.  Because **all three of my clients** are very concerned with confidentiality, they are more comfortable speaking at least initially, to your representatives in my Caldwell office…

(Emphasis added.)

53.     In his February 8, 2010 letter Attorney T copied only his three clients, Ferraioli, Al-Ayoubi, and Herrmann.  Attorney T did not copy either Zisa or Counsel for the City of Hackensack.

54.     On February 22, 2010, Attorney T's investigator, William Wilks ("Wilks"), met with the BCPO and turned over the following materials containing allegations concerning the 2008 Car Accident: HPD MVA Report 0802904 (the 2008 accident report for Zisa's former girlfriend, KT[6]); a statement of Arosemowicz taken by Wilks on January 22, 2010; a statement of Herrmann taken by Wilks on January 29, 2010; an email dated January 31, 2010 from Herrmann to Wilks; and a CD and statement of Al-Ayoubi dated February 8, 2010.

55.     A BCPO Investigative Report signed by Detective David Rodgers and dated September 17, 2010, referencing case number CIU 2010-005a (CIU was then supervised by Haviland and Keitel), includes entries indicating that Wilks met with BCPO staff, and the evidence receipt makes it clear that Wilks met with defendant Haviland.

56.     Wilks met with employees of the BCPO at least one more time, including Keitel and defendant Haviland, on March 3, 2010.  On this follow-up occasion Wilks conveyed allegations concerning a second, even older event which had occurred in 2004 (the "2004 Altercation," addressed more fully below).

---

[6] The Appellate Division saw fit to reference KT by her initials, clearly to protect the identity of her son, RT, discussed further below.  Zisa is following that course here.  It is believed that all defendants know the identities of both KT and of RT.

57.     Specifically, the BCPO Investigative Report concerning the 2004 Altercation signed by Detective Rodgers, referencing case number CIU 2010-005b, reads in pertinent part on page 2 as follows:

> On March 3, 2010, Mr. William Wilks, private investigator for [Attorney T], met with Assistant Prosecutor Dan Keitel, Sergeant John Haviland, Detective Gary Robinson and myself at the Bergen Prosecutor's Office where he provided information relative to the actions of Chief Zisa. He provided us with information Hackensack Police Case #0422543 relative to an assault and robbery of [AA- who was then a juvenile] that occurred on September 1, 2004. No arrests were made. According to William Wilks one of the suspects was identified as [RT], the son of [KT], and the live-in girlfriend of Chief Zisa. Wilks reported that RT was never charged in the matter due to his association with Chief Zisa and the victim was paid off. Wilks further alleged that RT's name was removed from the police report.

58.     Thus, the initial information gathering in Zisa's case was not done by a neutral law enforcement officer; rather, it was performed by an advocate for the administratively charged police officers – Ferraioli, Al-Ayoubi, and Herrmann, who became "witnesses" against Zisa.

**2.     The 2008 Car Accident**

59.     Initially, the allegations raised by the three administratively charged officers against Zisa, as part of their extortion attempt to secure the dismissal of those charges, concerned the 2008 Car Accident.

60.     The 2008 Car Accident refers to a single vehicle automobile accident involving KT, who at the time of the accident was Zisa's former girlfriend. While KT and Zisa still were living in the same home, they had ended their romantic relationship well before the car accident. The car involved was owned by Zisa, and as a result of the accident the car could not be driven.

61.     The first "officer" to arrive on the scene of the 2008 Car Accident was Arosemowicz. Shortly thereafter, Al-Ayoubi arrived, and Arosemowicz left the scene. KT called Zisa and Zisa went to the accident scene. Zisa spoke to Al-Ayoubi, who informed Zisa that Al-Ayoubi already had the information he needed from KT, that Zisa could take KT home, and that

Al-Ayoubi would "wait for the wrecker," which is slang for a tow-truck. Zisa then drove KT home.

62.     No charges or summonses were issued to KT at the time of the accident. An insurance claim was submitted by Zisa for repairs to his car, and the claim was paid.

### 3.     The False and Belated Allegations Regarding the 2008 Car Accident

63.     In 2010 it was alleged for the first time by police officers facing administrative charges, as part of an attempted extortion to secure the dismissal of those charges, that KT had been driving under the influence of alcohol when the 2008 Car Accident occurred.

64.     Not a single contemporaneous document or police record suggests that KT appeared to be under the influence of alcohol.

65.     It also was falsely alleged by both Al-Ayoubi and Herrmann that both Al-Ayoubi and Herrmann were present at the accident scene when Zisa arrived. Al-Ayoubi was present. Herrmann was not.

66.     Herrmann also claimed that on the day following the accident he picked up Zisa at the dealership repairing Zisa's car, whereupon Zisa allegedly threatened him, telling him to keep the circumstances of KT's accident secret.

67.     As is addressed below, the above allegations concerning the 2008 Car Accident (the "2008 Allegations") were entirely and demonstrably false.

### 4.     The 2004 Altercation Involving KT's Son

68.     While the effort to force Zisa to drop administrative charges against the three police officers initially was predicated upon allegations concerning the 2008 Car Accident, later Wilks, the investigator for the three administratively charged officers, added allegations against Zisa concerning an even older incident, the 2004 Altercation.

69.     The 2004 Altercation involving KT's then 16 year old son, RT[7], occurred just after midnight on September 1, 2004. The incident involved a dispute over a girl between RT and two of his teenage friends, on the one hand, and another teenager, AA[8], on the other.  The three teenagers taunted AA, and then one of RT's friends punched AA as they were leaving, causing him to lose a tooth.

70.     HPD records pertaining to the 2004 Altercation indicate that the case was investigated promptly and handled properly.

71.     Campos prepared the initial police report shortly after the altercation occurred in the early morning hours of September 1, 2004. Neither RT's name, nor the names of the other two teenagers involved, appeared in Campos' initial police report, as their identities were unknown to the HPD when she drafted it.

72.     A "flyer" (or BOLO - "Be on the lookout") was generated from Campos' initial police report at 3:27 a.m., on September 1, 2004.  The flyer made it clear that only preliminary information was known, and that the actors, including RT, had not yet been identified when Campos's report was written.  The flyer was generated by HPD Officer Bernadette Jardines, who testified that she had to have used Campos's report to generate the flyer.

73.     During the evening of September 1, 2004, more than 12 hours after the altercation, the matter was investigated by Detectives Thomas Aletta and Sara Malvasia.  Their investigation led them to RT.  HPD Detective Aletta then requested that RT and his mother, both of whom were living with Zisa at the time, go to the Hackensack Police Station.  During the ensuing interrogation

---

[7] As RT was a juvenile at the time of the 2004 Altercation, he is being referred to by his initials.  It is believed that all defendants know the identity of RT.

[8] Similarly, as AA was a juvenile at the time of the 2004 Altercation, he is being referred to by his initials.  It is believed that all defendants know the identity of AA.

by Detective Aletta, and upon receiving his <u>Miranda</u> warnings, RT admitted to his role in the incident, and signed a written confession.

74.     RT, as well as the two other teenagers involved, who also confessed to their roles, then paid restitution to cover AA's dental work, in what is commonly referred to in the Attorney General's Guidelines as a "stationhouse adjustment." AA's father, JA, indicated that that was how he wanted the case resolved, and never complained about the outcome.

75.     As a result of the investigation conducted by Detectives Aletta and Malvasia, and the resultant confessions, the names of RT, and the two other teenagers, were included in the follow-up report prepared by Detective Aletta.

76.     RT's confession, the follow-up report identifying him, as well as the restitution receipt, each were processed in the normal course and remain in the HPD's records to this day. These records also were available to and known by the BCPO.  In fact, these very records were produced by the State in discovery.

77.     Zisa had no role whatsoever in either the investigation of the 2004 Altercation involving KT's son, or its resolution.

**5.     <u>The False and Belated Allegations Regarding the 2004 Altercation</u>**

78.     In 2010, some six (6) years *after* the 2004 Altercation, it was alleged for the first time that Zisa had illegally used his office to bestow benefits upon RT.  Specifically, it was alleged for the first time that Zisa somehow directed Campos to conceal the identity of RT, and to provide a favorable disposition (the "2004 Allegations").

79.     Once again, and as is addressed below, these allegations were entirely and demonstrably false.

6.     **Defendants' Conspiracy and Misdeeds Associated with the 2008 Car Accident**

80.     With respect to the 2008 Car Accident, the BCPO based its case in large measure on belated allegations by Al-Ayoubi, Herrmann, and Arosemowicz that KT appeared to be under the influence of alcohol at the time of the accident.  All three of these witnesses were biased, and other evidence proved all three to be untruthful.

81.     Al-Ayoubi was suspended, and was facing both administrative charges and termination, when he first levied his false allegations. The defendants conspired to bolster Al-Ayoubi's testimony by causing the administrative charges against him to be dismissed, and by having defendant Herrmann falsely claim that he too was at the scene of the accident, and observed KT to be under the influence of alcohol.  Herrmann went so far as to falsify a police record, the HPD Event Card, to make it appear that he had been at the accident scene.

82.     Records obtained by Zisa, unfortunately only at the start of the trial due to Keitel's apparent efforts to conceal this evidence and prevent Zisa from making pretrial use of it in motion practice, clearly demonstrated that Herrmann perjured himself.  More specifically, the records demonstrated that Herrmann was the arresting office in a separate, unrelated domestic violence incident at the time of KT's accident, and that he was not, and could not have been, at the scene of the 2008 Car Accident.

> a.  *Almost immediately after Zisa's indictment, the administrative charges against Al-Ayoubi based upon illegal steroid use were dismissed, saving Al-Ayoubi from termination and the loss of his pension.*

83.     Al-Ayoubi's allegations concerning the 2008 Car Accident were both central and critical to the State's case.

84.     However, in 2010 Al-Ayoubi was facing administrative charges, which should have resulted in his termination, after he tested positive for using illegal drugs, specifically, illegal and dangerous steroids.

85.     Consequently, the defendants conspired to have the charges against Al-Ayoubi dismissed.  And, indeed, within days of announcing Zisa's indictment on or about October 19, 2010, and while Internal Affairs was under the control of Haviland, Keitel, and Condon (as addressed more fully below), the administrative charges against Al-Ayoubi were publically dismissed, and he was restored to full duty.  Al-Ayoubi was given back his weapon, and he was assigned to the juvenile unit of the HPD.

> b.  *Despite Al-Ayoubi's initial efforts to challenge reasonable suspicion supporting his urine test, the Hon. Susan D. Wigenton, U.S.D.J., determined that reasonable suspicion existed*

86.     Initially, Al-Ayoubi tried to dispute the reasonable suspicion that led to his urine test that revealed his use of illegal drugs.  However, in a decision written by the Hon. Susan D. Wigenton, U.S.D.J., and rendered on December 28, 2011, this Court found that reasonable suspicion had existed and that Zisa had acted properly in approving that a urine test be performed on Al-Ayoubi.  Al-Ayoubi v. City of Hackensack, No. 10-02592, 2011 U.S. Dist. LEXIS 148626 at *21 (D.N.J. Dec. 28, 2011).

> c.  *Al-Ayoubi admitted that he was part of the "steroid culture" and provided information about other cops abusing steroids as well, yet the public excuse for dismissing Al-Ayoubi's charges for using illegal steroids was that there was no proof he intentionally took them.*

87.     On October 29, 2010 at 11:43 a.m. Condon forwarded to Haviland and HPD Detective Sylvia Presto, another member of Haviland and Keitel's CIU, an email that Condon had received from Philip George, an attorney hired by the City of Hackensack, dated October 29, 2010

at 11:18 a.m. (the "George email"). Condon requested that Haviland and Presto "please call me regarding this when done reading."  See George email, a copy of which is attached as Exhibit B.

88.     The email from attorney George to Condon explained that Al-Ayoubi had been cooperating with the HPD, and had provided information about steroid use within the HPD. Indeed, Al-Ayoubi had admitted that he, along with approximately twenty (20) other HPD officers, were patients of High Crest Health in Fairfield, from which they received prescriptions for steroids. Al-Ayoubi described the doctor who owned High Crest, and that doctor's concerns over another named officer being "out of control" while at his office.  Al-Ayoubi described that the named officer had been upset because High Crest cut the dosage of his steroids, and that officer had to purchase additional steroids through the internet, from Applied Pharmacy in Las Vegas, Nevada.

89.     Attorney George further explained that Captain Salcedo at HPD already had provided this information to a detective at the BCPO, and then, after receiving no response, forwarded it yet again to Detective Presto by phone on July 26, 2010.  While Presto had told Salcedo that she would consult with her superiors and get back to him, she never did.

90.     When Presto failed to get back to Captain Salcedo, Salcedo directed his attorney to put the information into a letter and send it to Haviland.

91.     George's email to Condon demonstrates that the BCPO and the HPD, then under Padilla and Lo Iacono, were aware of Al-Ayoubi's admission and that, indeed, Al-Ayoubi's legitimate and serious administrative charges were being covered up.

92.     In his email to Condon, attorney George acknowledged Al-Ayoubi's admissions clearly were relevant "to the disciplinary charges against Al-Ayoubi since it shows his involvement in the steroid culture and puts the taped conversation that he had [with another officer] which was about steroids and was the justification for [Al-Ayoubi's] urine test in an even stronger context,

justifying the test…"  Nevertheless, George revealingly went on to note that "**however, we do not want to compromise any criminal investigation**." (Emphasis added.) See George e-mail, a copy of which is attached as Exhibit B.

93.     The criminal investigation referenced by attorney George was that of Zisa.    In order to safeguard that criminal investigation, Condon forwarded George's email to defendant Haviland, who was leading the Zisa investigation.

       *d.  Notwithstanding Al-Ayoubi's admission to illegal steroid use, Haviland and Condon arranged for the dismissal of the administrative charges against Al-Ayoubi*

94.     At approximately 3:00pm on October 29, 2010 – mere hours after receiving the Condon email – Haviland conducted a conference call with Condon, Dennis Calo (then special counsel to the City of Hackensack and now First Assistant Bergen County Prosecutor), and Calo's then partner.

95.     Just six days later, Haviland forwarded a memo, dated November 4, 2010, to BCPO Chief Steven Cucciniello, with a subject line of "DISMISSAL OF CHARGES AGAINST PO JOSEPH AL-AYOUBI" (the "Haviland Memo").

96.     The Haviland Memo goes on to describe that three days before, on Monday, November 1, 2010 at approximately 12:00 a.m. (midnight), Condon informed Haviland that "the Hackensack Police Department on the advice of special counsel is dismissing the administrative charges against Al-Ayoubi with respect to his positive drug test."

97.     The Haviland Memo notes that the owner of the laboratory which did Al-Ayoubi's urine testing had advised that he can't rule out that "supplements cause[d] the positive result."

98.     Haviland's memo conveniently makes no mention of the George email, which he received only six days before, making it clear that Al-Ayoubi was intentionally taking steroids and was part of the "steroid culture."

99.     On November 1, 2010, two days after Condon sent Haviland the George email and after conferring with Haviland, Calo sent a memo to Lo Iacono regarding "City of Hackensack-Officer Joseph Al-Ayoubi" ("the Lo Iacono Memo").

100.    The Lo Iacono Memo details that Al-Ayoubi's urine sample first was sent to the New Jersey State Police Laboratory in Newark for analysis.  The sample next was sent on to Aegis Analytical Laboratories in Nashville for that lab to perform analysis for potential anabolic steroids. The Aegis Laboratory reported a positive finding for Methandienone, an illegal anabolic steroid. The Lo Iacano Memo describes that Calo participated in an interview of Dr. Timothy Robert, who oversees all Aegis laboratory analysis.

101.    According to the Lo Iacono Memo, Dr. Robert reiterated that the positive finding for Methandienone meant that the steroid had had to have been ingested by Al-Ayoubi.

102.    The Lo Iacono Memo goes on to state, "**There is no doubt that Officer Al-Ayoubi did ingest an illegal steroid**." (Emphasis added.)

103.    However, the Lo Iacono Memo then states that Dr. Robert explained that he could not testify, and that there was no way to determine, whether Al-Ayoubi knowingly ingested the illegal steroid.

104.    Notably, no toxicologist in the world can testify as to whether or not a substance was intentionally ingested.

105.    Al-Ayoubi's admissions that he was part of the "steroid culture" aside, there is no requirement to prove intent with regard to drug violations under the New Jersey Law Enforcement

Guidelines.  Al-Ayoubi's positive test for illegal steroids would have resulted in his termination but for the interference of Haviland, Condon, Lo Iacono, and others to preserve Al-Ayoubi's purported integrity as a witness.

106.    The Lo Iacono Memo goes on to describe that Al-Ayoubi was using dietary supplements in connection with his "physical conditioning regimen."  And, the Memo concludes that since Al-Ayoubi may have unknowingly ingested the illegal steroid, the attorney for the City of Hackensack recommended dropping the charges against Al-Ayoubi.

107.    Condon, Haviland, and the City of Hackensack had evidence that Al-Ayoubi intentionally took steroids, and that he was he part of the "steroid culture," from Captain Salcedo.  Methandienone is a dangerous and controlled steroid.

108.    The value of this "gift" to Al-Ayoubi – the dismissal of the charges against him and enabling him to keep his job – exceeds one million dollars, as it includes a pension and other benefits.  The dismissal of Al-Ayoubi's administrative charges were announced just 12 days after Zisa was indicted.

109.    Others also suffered for reasons likely related to Al-Ayoubi's steroid use and the aggressive behaviors associated with using them.  In 2009, before Al-Ayoubi was tested for illegal steroids, he and Herrmann, again acting together, arrested a man named Woodley, who mysteriously ended up needing stiches to close a wound to his mouth.  The criminal complaint against Woodley was dismissed.  Woodley filed a federal complaint against Al-Ayoubi and Herrmann, alleging that Al-Ayoubi beat him, and then Al-Ayoubi and Herrmann covered it up.  The Hon. Katharine S. Hayden, U.S.D.J., wrote a decision denying Al-Ayoubi and Herrmann summary judgement on Woodley's claim of excessive force, pointing out that their account of the facts and assertions did not comport with other documents, such as the ambulance call report in

the case, which supported Woodley.  Woodley v. Al-Ayoubi, No. 09-1403, 2011 U.S. Dist. LEXIS

115517 (D.N.J. Sep. 27, 2011).  Woodley, who, based on information and belief, is homeless and

was *pro se*, settled the matter in 2016.

> e. *Herrmann and Al-Ayoubi lied about Herrmann being at the scene of the 2008 Car Accident.*

110.    Al-Ayoubi was suspended for illegal drug use at the time these false claims against

Zisa were initially reported, and was facing termination.  Based on information and belief, this

caused defendants Herrmann and Al-Ayoubi to falsely claim that both Herrmann and Al-Ayoubi

were at the scene of the 2008 Car Accident.   In truth, only Al-Ayoubi was present.

111.    Demonstrating that Herrmann was not there proved to be difficult.  It was only at

the start of his trial that Zisa learned that Herrmann was "simultaneously" the arresting officer in

an unrelated arrest at the same time that he claimed to be at the scene of the 2008 Car Accident,

when the HPD responded to Zisa's subpoena for this information.

112.    Keitel objected to Zisa's request to the court to permit subpoenas to be returnable

in advance of trial.

113.    Haviland and Molina (and Keitel) had access to Herrmann's true whereabouts at

the time of the 2008 Car Accident all along and, based on information and belief, attempted to

delay and prevent Zisa from learning this significant fact, as that information demonstrates that

both Herrmann and Al-Ayoubi were lying.  Because the fact of Herrmann's unrelated other arrest

was not known with particularity to Zisa pre-trial, Zisa was prevented from making appropriate

motions for dismissal, or minimally, for severance.

114.    Based on information and belief, the BCPO, with full control of the HPD, also

possessed this information.  The defendants conspired to prevent Zisa from learning this fact.

115.    The documentation associated with Herrmann's unrelated arrest demonstrates that he was elsewhere at the time of the 2008 Car Accident.  Indeed, Herrmann was arresting, transferring, and processing a domestic violence prisoner at that very moment, and then had to document that arrest.

116.    Only on the eve of trial – when faced with Zisa's continuing demand to receive Herrmann's service records – did Keitel issue his own subpoena, nearly identical to that of Zisa's, for the records associated with Herrmann's arrest from the night of KT's accident. Both subpoenas were returned simultaneously to the Court.

117.    Based on information and belief, the State's subpoena was an attempt to provide Haviland and Keitel with cover when the facts they knew were coming forward were exposed.

>    *f.   In addition to providing false testimony as to his whereabouts, Herrmann also falsified a police report creating false evidence that he was present at the 2008 Car Accident.*

118.    In 2008, at the time of the 2008 Car Accident, the HPD maintained "Event Cards" for each call to which officers responded.  The Event Cards were filled out contemporaneously by the desk officer documenting the names of each officer responding to each call.  Within 24 hours of an Event Card being created, the information from the Event Card then was inputted into the HPD electronic system, creating a "blotter" of the day's activity.  The physical Event Cards then were filed and kept at the HPD.

119.    The Event Card relating to the 2008 Car Accident correctly included Al-Ayoubi's name as the responding officer.  The Event Card later produced by Keitel also had Herrmann's name on it, however, Herrmann's name was in handwriting different from that of the rest of the information on the card.  See Event Card, a copy of which is attached as Exhibit C.

120.    Herrmann's name was not in the blotter for the entry relating to the 2008 Car Accident. <u>See</u> Blotter, a copy of which is attached as Exhibit D.

121.    Lieutenant Richard Levis, who at the time of Zisa's trial was in charge of the HPD's records, recognized the handwriting of Herrmann's name on the Event Card, and identified it to be that of Herrmann himself.  Levis further testified that Herrmann, as well as all of the HPD officers, had access to the files of Event Cards.

122.    Levis testified that the absence of Herrmann's name from the blotter entry relating to the 2008 Car Accident means that Herrmann's name was not on the Event Card when the blotter was created.

123.    Lastly, Levis testified that responding officers do not put their own names on Event Cards. Event Cards are prepared by the desk officer and are the desk officer's duty.

124.    These facts demonstrate that Herrmann accessed the Event Card and added his name after the fact, in furtherance of the conspiracy and in an attempt to insert himself into the 2008 Allegations.

125.    To date, Herrmann has not been disciplined for falsifying the Event Card, or for perjury relating to his false claim that he was at the scene of KT's accident.

> g.  *Herrmann and Arosemowicz – "witnesses" to the 2008 Car Accident – attempt to conceal their relationship and conspiratorial meetings.*

126.    Although Herrmann and Arosemowicz attempted to conceal their relationship and coordination, the trial revealed that Herrmann and Arosemowicz spoke before each interview by Wilks or with the BCPO.

*h. Arosemowicz's "explanation" for why his records never made reference
to KT alledgedly appearing to be under the influence was debunked.*

127.    Arosemowicz – who then had ties to both the PBA and others in HPD - furthered the conspiracy by falsely claiming, as the first law enforcement officer on the scene of the 2008 Car Accident, to have observed that KT was drunk.  Arosemowicz also falsely claimed that he then turned the matter over to HPD to investigate allegedly because he didn't know how to perform a DUI investigation.

128.    Discovery revealed, however, that Arosemowicz had in fact previously participated in DUI stops, and that, had there truly been concerns with a perceived conflict presented by Zisa's role in the HPD, Arosemowicz could have either handled KT himself or contacted the Bergen County Police, who also had trained DUI officers.  He did neither.

129.    Not surprisingly, not one piece of paperwork prepared by Arosemowicz, including his log for that day, mentions that KT had been drinking alcohol or was suspected of driving under the influence.  Rather, Arosemowicz's log simply describes the 2008 Car Accident as a car accident with no injuries.

130.    Arosemowicz had his own administrative issues for a host of indiscretions, including sleeping on the job. Specifically, he had been captured on security footage, soundly sleeping on duty in the control room at the Sheriff's office.  He had even lowered the lights in the control room, and had turned his computer monitor away from him so as not to cast light.

*i. Zisa was arrested and charged with insurance fraud relating to the 2008
Car Accident despite the fact that no probable cause existed.*

131.    Under New Jersey law, when there is an automobile accident, insurance companies will pay for the necessary repairs to the vehicle regardless of whether or not a driver was drunk.

132.   In other words, even if the allegation that KT was intoxicated at the time of the 2008 Car Accident were true – and it is not – there was no insurance fraud.  In order to support a charge of insurance fraud, there has to be a material misrepresentation.  Whether or not KT was intoxicated was not a material issue to the payment of the claim.

133.   Molina, having no probable cause, arrested Zisa for insurance fraud on April 29, 2010.

### 7.   Defendants' Conspiracy and Misdeeds Associated with the 2004 Allegations

134.   With respect to the 2004 Altercation, the BCPO based its case in large measure on testimony of Campos (i) placing Zisa at HPD's headquarters on the day of the incident, and (ii) indicating that RT's name initially had been inserted in, and then at Zisa's direction removed from, the initial investigation report prepared by Campos.  The BCPO also falsely intimated pre-trial that the initial investigation report at issue suspiciously had been deleted from HPD's server.

135.   In fact, Zisa was not at HPD's headquarters at the time Campos was drafting her report, and played no role in either the investigation or resolution of the 2004 Altercation.  Campos claimed that she had a refreshed recollection of Zisa being at HPD headquarters brought on by reviewing her journal, which, as described below, turned out to be a lie.

136.   RT was never identified in the initial report as drafted by Campos, as his identity remained unknown to the HPD at the time she drafted it.

137.   Finally, expert testimony revealed that defendant Campos' initial investigation report still resided on, and had not been deleted from, the HPD's server.

> a.   *The BCPO Computer Forensic Report Attempted to Create False Evidence that the Campos Report had been Deleted.*

138.   In 2004, reports at the HPD were prepared using computers operated through the HPD server.

- 28 -

139.    Shortly after Zisa was arrested in April of 2010, the BCPO seized the HPD server.

140.    The BCPO did not provide the results of its forensic computer examination of the HPD server until approximately one month before Zisa's scheduled trial date in 2012.

141.    The purported computer forensic analysis report that Haviland orchestrated was a farce.  Specifically, the BCPO's report dated November 21, 2011 reads in pertinent part as follows:

> On 8/3/11 at 10:30 AM, Detective Sgt. Sharon Malone of the Bergen County Prosecutor's Office Computer Crimes Unit submitted the above evidence for analysis.  She was given this evidence, along with the analysis request from Detective Sgt. John Haviland of the BCPO's Confidential Investigations Unit.  Sgt Haviland explained that Chief Charles Zisa, of the [HPD] was indicted for misconduct.  It is alleged that on or about 9/1/2004, he instructed PO Laura Campos to alter an investigation report involving the assault of [AA] on 09/01/2004 in the area of Esplanade and Blanchard, Hackensack.  Specifically, she was instructed to have the name "[RT]" removed as a suspect.

142.    Sgt. Haviland also indicated in the request for examination that Detective Aletta authored a follow-up report on this incident on or about September 15, 2004.  The request to the BCPO Computer Crimes Task Force stated, "It is requested that the forensic analysis carry out the following examination on the submitted server hard drives:

- Search for remnants of any reports or database entries referencing the aforementioned incident.
- Search for any remnants of PO Campos's original report, as well as any modifications to this report from 09/01/2004 onward.
- Search for any remnants of Det. Thomas Aletta's reports from 09/01/04 through 09/15/04 pertaining to the aforementioned incident.  Specifically search for reports which reference "[RT]" as a suspect.
- Search for any references to "[AA]", [AA's address]"

143.    The BCPO Computer Forensic Analysis Report detailed its "examination" of the server, and then went on to "conclude":

> Based on the examination of the evidence submitted in this case (nine hard disk drives) it can be said within a reasonable degree of scientific certainty that references to the incident, [RT], and Detective Thomas Aletta were located on the submitted evidence.   No references to PO Campos' incident report were located on this submitted evidence.

144.   The quoted section above was implying that Campos' initial investigation report had been deleted from the HPD server.

145.   The BCPO Computer Forensic Analysis Report conclusion continued and described a very convenient circumstance that allegedly limited its forensic investigation:

> Evidence drives HDCI20100051 through HDCI20100059 were part of a RAID (Redundant Array of Independent Disks) configuration on the Hackensack PD server.   In order to properly determine the file system and structure, and consequently the file dates, it is necessary to "virtually" rebuild the RAID structure on the forensic analysis system.  For a hardware based RAID system, as was in use on the Hackensack server, it is necessary to have the specific configuration parameters of the RAID system.  Since this information was not provided to this examiner, it was not possible to rebuild the file system in its native format.  This caused all recovered data to be marked as being located in "unallocated Space".  This then makes it impossible to recover or determine any file timestamps associated with the recovered data.

146.   Keitel repeatedly objected to Zisa conducting his own forensic examination of the HPD server, claiming that despite the fact that Zisa was the Chief of Police for the entire duration that the seized computer server was active, it would be dangerous for informants and confidential witnesses for Zisa to be provided with access.

147.   Eventually, after several hearings, including having to have Zisa's forensic examiner go before the Court and assure the Court that Zisa would only be provided case relevant material limited to State-approved search terms, Zisa was permitted to have his own computer forensic examiner, John Lucich of eForensix, perform a limited forensic examination of the server. The Court's order, in response to the BCPO's strident and repeated objections, restricted Zisa to searching certain terms relating only to the 2004 Allegations.

148.   Lucich, Zisa's expert, had less than a month to perform his own analysis of the server, and was not permitted to search for anything relating to the 2008 Allegations.

149.   Lucich was able to rebuild the RAID in approximately 8 minutes.

150.     Lucich noted that the server disks were numbered, and that he was able to readily rebuild the RAID simply by installing the disks in the sequence of their numbering.

151.     Because Lucich successfully rebuilt the RAID, timestamps and files were available and flew in the face of Campos' allegations.

152.     Lucich recovered Campos' initial investigation report.

153.     Lucich was able to demonstrate that Campos' report had not been deleted.

154.     Lucich was able to show that all of the reports concerning RT remained on the HPD server and none had been deleted.

> **b.** *Campos initially said Zisa was not present at HPD when she prepared her original investigation report, then changed her testimony to inculpate Zisa based on allegedly reviewing her journal, then after continuing to lie about the journal she finally admitted that there was no journal.*

155.     The primary witness against Zisa with respect to the 2004 Allegations was Campos.

156.     On March 16, 2010, Campos gave a sworn statement to BCPO Detective Gary Robinson and Molina concerning the 2004 Altercation.  In that statement, Campos alleged that she had to rewrite the investigation report "multiple" times and at one point alleged she was told by Detective Aletta to "take [RT] out."  Campos further stated that "later on" she learned that [RT] was the son of Zisa's girlfriend at the time.

157.     During Campos' March 16, 2010 statement, when asked if Zisa was present while she was preparing the report or if she had ever seen him that night, Campos answered "No, sir." During her statement she reiterated twice more that she had not seen Zisa that night.  She was quite clear in her responses.

158.     In a follow-up statement provided on June 4, 2010 Campos suddenly "remembered" Zisa being in the hallway at the HPD while she was preparing the initial investigation report regarding the 2004 Altercation.  Campos attributed her sudden, refreshed

recollection to reviewing her "journal." Campos later admitted to the Court that she did not have

a journal, and anything she did have was thrown out in 2008, two years before her "recollection"

that inculpated Zisa.  Campos' perjury is addressed in greater detail below.

       *c.  Additional witnesses indicated that Zisa was not present, and that he*
          *played no role in the investigation and resolution of the 2004 Altercation*
          *involving RT.*

159.    On March 18, 2010, Molina interviewed the father ("JA") of AA, the juvenile

involved in the 2004 Altercation.  JA informed Molina that he had been involved in the decision-

making process concerning the disposition of the 2004 Altercation, and that he believed that the

investigation had been "handled correctly."  He made no mention of Zisa.

160.    On March 26, 2010, Haviland interviewed Detective Malvasia of the HPD.

Malvasia was the partner of the case detective, Detective Aletta, in investigating the 2004

Altercation. During her sworn statement, Detective Malvasia told Haviland that she had no

recollection of seeing Zisa in police headquarters on the night of the incident, nor was she aware

of Zisa "intervening in this investigation at all."

161.    On April 20, 2010, the BCPO spoke a second time with Detective Malvasia.

Malvasia's second interaction, this time with both defendants Haviland and Molina, was an

interrogation, where Malvasia was given Miranda warnings. Nonetheless, Detective Malvasia

reiterated that she had no recollection of Zisa being in police headquarters on the night of the 2004

Altercation.

162.    During the course of Malvasia's second statement on April 20, 2010, Molina

acknowledged that the investigating detective, Detective Aletta, had made a mistake with the date

on the documentation relating to RT's confession.

163.    While Detective Aletta had started his shift in the late afternoon of September 1, 2004, by the time he secured RT's confession it was after midnight, and thus September 2nd. Detective Aletta mistakenly put the wrong date (September 1st, as opposed to September 2nd) on the paperwork associated with RT's <u>Miranda</u> warnings.

164.    Despite Molina's acknowledgment, Zisa was charged and prosecuted based on a knowingly false theory that: (1) Detective Aletta obtained a confession from RT, (2) Detective Aletta then permitted RT to leave the police station, (3) Campos removed RT's name from her report to hide his identity, and (4) all of this was done because of Zisa.

165.    When the charges were brought against Zisa, Haviland, Molina, and others had in their possession Detective Aletta's follow-up report identifying RT, as well as RT's signed confession, and the relevant restitution receipts, which records had been processed in the normal course through the HPD.

166.    This story was fabricated by Defendants in an attempt to portray what occurred as malfeasance, in light of the fact that RT's confession, his friends' confessions, the supplemental report naming RT and his friends who participated in the altercation, and the restitution were all part of the HPD record.

167.    Haviland and Keitel also criminally charged Detective Aletta and Captain Danilo Garcia, similarly with no evidence against them, alleging they facilitated carrying out Zisa's alleged command to remove RT from the report. Keitel then objected to severing the 2004 Allegations from the 2008 Allegations, but requested instead to sever Aletta and Garcia from Zisa, and go to trial first with Zisa.  By doing so, Keitel ensured that Zisa would not be able to secure testimony from Aletta and Garcia at Zisa's trial. KT, who was also indicted in relation to the 2008 allegations, went to trial with Zisa.

168.     Detective Aletta and Captain Garcia were both acquitted following a separate bench trial after Zisa's trial concluded.

169.     KT was convicted of Insurance Fraud by the same jury that convicted Zisa.  Keitel then permitted KT to be diverted into Pre-Trial Intervention at her sentencing.  Based on information and belief, KT was only charged to make it more difficult for her to offer testimony that would have been favorable to Zisa.

*d.  Haviland becomes aware of "a problem" with Campos' testimony.*

170.     On May 18, 2010, Campos filed a federal lawsuit against Zisa, the City of Hackensack, and others, based on facts supposedly consistent with the BCPO's claims against Zisa.

171.     Critical facts contained within Campos' civil lawsuit, however, were not the same.

172.     Indeed, upon reviewing the facts as alleged in Campos' civil suit, Haviland immediately understood and shared in an email to Molinelli dated May 20, 2010: "It appears we have a problem."

173.     More specifically, in his May 20th email Haviland pointed out that Campos, in her March 16th sworn statement, made it very clear that she did not see Zisa on the night she prepared the initial report regarding the 2004 Altercation.

174.     Haviland further noted in his May 20th email to Molinelli that, in her civil lawsuit, Campos accused HPD Captain Garcia of threatening her in order to conceal RT's role in the 2004 Altercation.  Haviland went on to note that, in contrast, in her March 16th sworn statement Campos never accused Captain Garcia of threatening her; rather, she had stated on that occasion that it had been Detective Aletta who had told her to remove RT's name from her initial investigation report.

175.     Haviland and others quickly set course to "fix" the perceived problems.

176.    Shortly after his May 20th "we have a problem" email, Haviland called the Internal Affairs officer at the HPD.  Using the power vested in him by the BCPO's supersession of the HPD and, more specifically the Memorandum of Understanding (addressed more fully below), Haviland directed the HPD to open an internal affairs investigation on Campos for the "administrative charge of misconduct" for "admitting" that she had changed a report at the order of Captain Garcia.  Haviland advised that this wrongdoing was discovered on May 15, 2010 when Campos and her attorney filed a federal lawsuit.

177.    Notably, when Campos previously claimed that she had changed her initial investigation report in her March 16, 2010 sworn statement, no internal affairs investigation was opened.

178.    A mere 20 minutes or so after directing the HPD to open an internal affairs investigation on Campos, Haviland officially superseded the investigation based upon the authority gained through the Memorandum of Understanding (again, addressed more fully below). Haviland then directed Campos to report to the BCPO to be interviewed.

179.    On June 4, 2010 Campos, along with counsel to the BCPO, reported to the BCPO, whereupon she was advised that she was being questioned concerning an allegation of misconduct for changing her initial investigation report concerning the 2004 Altercation involving KT's son. During Campos' second sworn statement, Campos was questioned by Haviland, with Detective Presto, one of Haviland's subordinates, also present.

180.    While the pre-interview discussion between Campos and Haviland remains unknown, the content of Campos' second sworn statement, provided on June 4th, is telling.

181.    In her June 4th statement, Campos stated that she did not recall responding to the 2004 call regarding AA which resulted in her writing her initial investigation report.

182.    Campos did not recall whether a robbery/assault even had occurred that night.

183.    Campos did not remember who the sergeants were who were working that night, or anything about the scene of the incident.

184.    Campos did not remember responding to the hospital, "speaking with a victim" or "even seeing anybody with a bloody mouth."

185.    Campos did not remember which sergeant assigned her to write the initial investigation report, what time she started writing it, when she completed it or to whom she submitted it.

186.    Yet, incredibly, and in direct contradiction of her previous sworn statement provided on March 16, 2010, Campos suddenly remembered on June 4, 2010 seeing Chief Zisa in the hallway some six years earlier on the night of the incident, and remembered being told by Captain Garcia to change her report to "take the actor out" because "that's what the chief wants."

187.    Aware that she was contradicting prior sworn testimony, Campos, likely aided by others, attempted to explain away her sudden, new recollections by claiming that those recollections were jarred by her review of an old journal – "that's why I went through my journals and then try [sic] to do some thinking."

188.    On October 12, 2010 when Haviland testified before the Grand Jury which returned the indictment in this matter, he presented that portion of Campos' statement regarding her journals and alleged refreshed recollection to the Grand Jurors.

189.    Tellingly, on May 26, 2010, six (6) days *after* Haviland's "we have a problem" email, and nine (9) days *before* Campos's false epiphany which led to her changed testimony so as to support the 2004 Allegations, Sgt. Molina, who worked under Haviland's supervision, signed a criminal complaint against Zisa for Official Misconduct in regard to the 2004 Altercation.  In

executing that criminal complaint without probable cause, Molina and the defendants knew that the charge was baseless.

> e. *Prior to Zisa's trial, a Judge reviewing Campos' same allegations in her civil suit concluded they were "not plausible."*

190.     Haviland was not the only person who found Campos's civil lawsuit to be problematic.  Well prior to Zisa's trial, the Hon. William J. Martini, U.S.D.J.,  reviewed Campos' civil complaint against Zisa, the City of Hackensack, *et al*.  Judge Martini dismissed certain counts pertaining to Zisa,  with a footnote labeling Campos' allegations "not plausible":

> Plaintiff Campos filed her report in 2004.  She brought this action in 2010 after "realizing for the first time that Chief Zisa and Defendant Garcia had conspired against her to alter [the] report,Opp'n Br. 23 (Plaintiff Campos "only recently… learned that the police report she was forced to write in 2004 by Garcia was false."). At first blush, it would seem that Campos should have known the truth or falsity of her own report, quite apart from anything she may have discovered in 2010 about Chief Zisa.  Likewise, if there were a victim involved in filing a false report, it would appear that the victim was the victim of the robbery (or its insurer) not the policeperson filing the less than complete report involving that robbery.  Without considerable more detail, one must conclude that **Campos' allegations are not plausible**.  Twombly, 550 U.S. at 557.

Campos v. City of Hackensack, No. 09-03076, 2011 U.S. Dist. LEXIS 33457, at *10 n.1 (D.N.J. Mar. 29, 2011) (Emphasis added.)

> f. *Campos admitted that there never was a journal.*

191.     Zisa sought access to Campos' alleged journal during discovery.  At the direction of Judge Edward Jerejian, J.C.S., the BCPO was to obtain and provide the Campos journal that allegedly refreshed her recollection and made her change her story.

192.     When the BCPO failed to produce the journal, Zisa renewed his demand for its production.

193.      Eventually, Haviland drafted a June 21, 2011 memo detailing his alleged efforts to obtain the journals from Campos.

194.     According to Haviland's June 21st memo, he contacted Campos on February 28, 2011 and requested that she produce her journal.

195.     Campos allegedly agreed to contact him after "considering" his request.

196.     Haviland's June 21st memo goes on to detail that on March 3, 2011, Campos advised Haviland that she "reviewed her journal and that there were no notations about the robbery incident of [AA]" (*i.e.*, the 2004 Altercation).

197.     Further, Campos allegedly refused to turn over her journal to the BCPO citing privacy reasons.

198.     Keitel advocated to the Court that Campos thought her journals were private and that there was nothing relevant in them.

199.     Upon securing the Court's permission, Campos was served with a subpoena requiring her to produce the journal for inspection.

200.     Campos appeared in court on July 28, 2011 and was asked about the journal by Judge Jerejian. Campos responded, "I said I don't have them, I don't have any entries, I don't have them right now, I just moved." When asked by the judge, "Where is the journal?" she replied, "I have no idea. As a matter of fact, I don't know that there's anything that could be relevant to this specific-."

201.     At that point, Campos was interrupted by the Court. Judge Jerejian explained to Campos her options concerning the production of the journal. Campos then stated, "I don't have it, no, your Honor. It says here 2004, too, I don't even have that, I don't even think I have a journal for that time, so I don't have – it's not that I'm not wanting to provide it, I don't have it."

202.     Judge Jerejian next advised Campos that, "I'm going to give you an opportunity. You're saying that you moved, you don't know where it is, to locate it and produce it to the Court,

or consult with your attorney, and whatever other position you're going to take." He further advised her:

> We'll do it August 11th at 1:30. You come back in. You come back in on your own if you wish, it's up to you. If you can't locate it, can't find it, I'm going to swear you in under oath as to the disposition of it. If you have it, then bring it with you. And depending on the position you take, as I said, I can review it perhaps in camera, you can consult with an attorney, but at that point in time you'll be under oath and what you know about the journal.

203.   Upon Campos's return to court on August 11, 2011, Campos was sworn in and asked about the journal.

204.   Campos testified that she did not have the journal and that there never was a journal. She testified that she maintained journals with thoughts over the years concerning events at work and in her personal life, but that she threw them out when she moved in 2008.

205.   Campos' testimony on August 11, 2011 made it clear that she had lied during her second sworn statement on June 4, 2010, when she tried to explain away her changed testimony (as compared to her March 2010 statement), based upon a review of her journal. It is clear that she could not have referred to any journal between her March and June 2010 statements, since – to the extent such a journal ever existed – it was thrown out in 2008.

206.   As Campos was interviewed by the BCPO for the first time concerning the 2004 Altercation in 2010, two years *after* she "threw out" her journals, the fact that her allegations against Zisa were completely fabricated undoubtedly was known beyond any doubt by Haviland, Keitel, Molina, and other defendants by, at latest, August 11, 2011, following her admission to Judge Jerejian.

207.   It remains unknown to date whether Campos and Haviland developed this lie together, or with assistance from other defendants, but the fact that Campos was never disciplined

for her false testimony, both to the Court and to Haviland (his June 21, 2011 memo states that Campos reviewed her journal and there were no notations about the incident) is telling.

208.    All of this information was provided to Molinelli in August of 2011, with source material, by counsel for Zisa.  Counsel's letter included a request that the 2004 Allegations be dismissed.  The letter was also copied to Keitel.  Neither Molinelli nor Keitel ever responded.

## 8.    The Bergen County Prosecutor's Office Supersedes the Hackensack Police Department.

209.    Zisa was arrested pre-indictment on April 29, 2010.

210.    Nearly immediately, the BCPO administratively superseded the Hackensack Police Department citing to Zisa's arrest, coupled with the civil lawsuits initiated by several of the defendants (the "Supersession").

211.    The Supersession was an administrative action, and was achieved via a Memorandum of Understanding entered into on April 30, 2010 (the "Memorandum of Understanding").  The signatories to the Memorandum of Understanding were Molinelli and then Hackensack City Manager, Lo Iacono *See* Memorandum of Understanding, a copy of which is attached as Exhibit E.

212.    Based on information and belief, the BCPO drafted the Memorandum of Understanding and conspired with Lo Iacono to execute the document.

213.    The Supersession of the HPD was highly unusual.  Prior to the BCPO Supersession of the HPD, the Paramus Police Department had encountered at least 20 employee law suits, the Fairlawn Police Department experienced a vote of "no confidence" as against its Police Chief, and the Teaneck Police Department paid out millions of dollars in civil settlements and recoveries. None of those departments were superseded by the BCPO.

214.    As a direct result of the Supersession, the BCPO, and certain employees of the BCPO, including Haviland and Condon, assumed control of the HPD.

215.    In accordance with the Memorandum of Understanding, Condon was appointed by Molinelli to be "monitor."

216.    While Tomas Padilla was appointed the Acting Officer in Charge of the HPD during the Supersession, pursuant to the Memorandum of Understanding "[t]he determination as to whether the Acting Officer in charge has fully carried out his/her responsibilities pursuant to this Memorandum, is left to the sole and unfettered discretion of the Office of the Bergen County Prosecutor."

217.    The duration of the Memorandum of Understanding was left open-ended and at the discretion of the BCPO, noting "the decision to terminate the terms and conditions set forth in this Memorandum of Understanding shall rest solely and exclusively with the Office of the Bergen County Prosecutor."  _See_ Memorandum of Understanding, page 2-3, paragraph 3.

218.    Through the Memorandum of Understanding the BCPO assumed direct oversight of HPD's Internal Affairs.  As a result, the BCPO assumed control over investigations into and discipline of all HPD personnel.  Specifically, the Memorandum of Understanding stated, in pertinent part, as follows:

> The internal affairs function of the City of Hackensack Police Department shall for the duration of the Memorandum of Understanding, continue in the normal course but be directly overseen by the Office of the Bergen County Prosecutor, through the Monitor assigned or any other employee of the Bergen County Prosecutor's Office so designated by the Prosecutor.  No investigation or proceeding shall commence, nor charge filed, be it administrative, criminal or otherwise, without the prior express written approval of the Office of the Bergen County Prosecutor. **Through said Monitor, <u>personnel of the Bergen County Prosecutor's Office Confidential Investigations</u> Unit and those in their chain of command, may observe, direct or supercede [sic] in any internal affairs matter so ordered by the Bergen County Prosecutor.**  This provision shall apply soley [sic] to all current and future Internal Affair [sic] matters.  Any matters currently pending as a

Municipal Investigatory matter shall not be affected by this Memorandum, as they are functions of the City Government. **However, insofar as the Police Command shall have a role in such Administrative Proceedings, the Monitor may, in his or her judgment, take such action as may be deemed necessary in the best interest of the Police Department.**

(Emphasis added). *See* Exhibit E, page 4.

219.    Defendant Haviland and Keitel then were in charge of the BCPO's CIU.  Pursuant to the Memorandum of Understanding, they now were in control of HPD's Internal Affairs and discipline.

220.    Haviland was the head of the law enforcement arm of CIU. Running HPD's Internal Affairs Unit was outside of the scope of Haviland's law enforcement duties.

221.    Defendant Haviland and Keitel also had leading roles in the criminal investigation and prosecution of Zisa.

222.    The supersession of the HPD was an overt act in the conspiracy to deprive Zisa of his constitutional rights, and was an administrative act, transferring power to Haviland, Condon, and Padilla.

223.    Condon and Haviland abused their authority over the HPD to further their conspiracy to harm Zisa, by promulgating false evidence against Zisa, protecting and rewarding those delivering the false claims, and concealing exculpatory evidence.

224.    The supersession eventually ended when arguments concerning discovery of certain witnesses' Internal Affairs files were the subject of protracted pretrial argument.  Many of the requested internal affairs files of the witnesses against Zisa were not provided to Zisa.

9. __Haviland Manipulates the Grand Jury__.

       a. *Haviland alone testified regarding the 2004 Allegations to the Grand Jury.*

225.    On October 12, 2010, Haviland testified before the Grand Jury in reference to the 2004 Allegations.  Haviland was the sole witness who testified before the Grand Jury in that matter.

226.    Zisa requested to testify on his own behalf before the Grand Jury.  Zisa was not permitted to do so.

227.    In his presentation to the Grand Jury regarding the 2004 Allegations, Haviland read to the Grand Jury the bulk of Campos's second sworn statement provided on June 4, 2010, including the false incriminating information sworn to by her in that statement, namely her sudden recollection of seeing Chief Zisa in the hallway some six years earlier on the night of the incident, and being told by Captain Garcia to remove RT from her report because "that's what the chief wants."  Haviland included Campos' explanation of having gone through her "journals" to help her recollection.

228.    Haviland also read portions of Detective Malvasia's second statement to the Grand Jury, withholding from them her entire first statement and all the exculpatory information contained therein.

229.    The erroneous date innocently applied to the Miranda form by Detective Aletta was critical to Haviland's theory concerning the alleged criminal conduct. Despite Malvasia, Aletta's partner, indicating on four (4) separate occasions during her interrogation that the date entry was a simple mistake, Haviland concocted a nefarious purpose surrounding the mistaken date, arguing that RT's confession was obtained the day before, and before Campos's report was written.

230.    During his testimony to the Grand Jury, Haviland specifically referenced the erroneous date on the <u>Miranda</u> form on three (3) occasions.[9]

231.    On each occasion, Haviland conspicuously omitted Malvasia's explanation that the date was the result of a simple mistake, and that her partner had entered the wrong date on the form as a result of the date having changed during their shift at midnight.  Haviland intentionally withheld that explanation from the Grand Jury

232.    Haviland read a portion of JA's second statement, provided on April 30, 2010, to the Grand Jurors, minimizing JA's first statement, provided on March 18, 2010, and leaving out that the 2004 Altercation was handled the way JA, AA's father, had wanted it to be handled.

233.    The Grand Jury was not told of Campos' civil lawsuit against Zisa, or how Campos stood to gain personally by Zisa's indictment and prosecution.

234.    The Grand Jury was not told about the unlawful immunity deal provided to Campos.

*b.  The Presentation of the 2008 Allegations to the Grand Jury.*

235.    The 2008 allegations were presented on October 19, 2010, to the same Grand Jury that heard the 2004 allegations.  Haviland, again, was the sole witness.

236.    Once again, Haviland cherry-picked which statements to share with the Grand Jury and ignored critical facts.

237.    Haviland did not tell the Grand Jurors that Al-Ayoubi had been suspended by Zisa for testing positive for illegal drugs.

---

[9] Haviland mentioned that Malvasia stated "he messed up the **time** on the Miranda," but he never told the grand jurors that she said the date on the Miranda form was incorrect. (emphasis added)

238.    Haviland informed the Grand Jurors that Al-Ayoubi recognized KT from bars in Hackensack, improperly intimating that she was a heavy drinker and thus likely to have been intoxicated at the time of the accident.

239.    Haviland read portions of Wilk's "interviews" of Arosemowicz, Al-Ayoubi, and Herrmann in question and answer format to the Grand Jurors, but told the Grand Jurors that Wilks worked for the attorney representing Ferraioli.  Haviland left out that the same attorney also represented Al-Ayoubi and Herrmann, or that Al-Ayoubi and Herrmann were being disciplined by Zisa.

240.    The Grand Jury was not told of the *quid pro quo* threatened at Ferraioli's hearing by Attorney T.

241.    The Grand Jury was not told of any of the civil lawsuits filed by the witnesses, including Herrmann, Al-Ayoubi and Ferraioli, against Zisa (discussed further below), or how the "witnesses" stood to gain personally by Zisa's indictment and prosecution.

242.    The Grand Jury was not told about the unlawful immunity deals provided to Herrmann and Al-Ayoubi. The Grand Jurors did not know that Herrmann, Al-Ayoubi, and Campos, the main witnesses against Zisa – without whom this case could not have been brought – had been promised by Haviland and Keitel that they would not face criminal or administrative charges, and that this immunity went above and beyond the immunity permitted under New Jersey law.

243.    Haviland did not advise the Grand Jury that HPD's records created  serious and profound conflicts with information from both Herrmann and Al-Ayoubi regarding Herrmann's alleged presence at the scene of KT's car accident.

244.    Haviland also failed to follow up leads which were likely to lead to exculpatory findings. A voluminous amount of official reports and documents existed which had been contemporaneously created and filed by numerous HPD officers, and which directly contradicted the incriminating claims of key witnesses.  Investigating and confirming the veracity of those documents would have undermined the credibility of material accusations and witnesses alike.  By ignoring these contradictions, Haviland misled and manipulated the Grand Jury.

### c.   Zisa is indicted

245.    On October 19, 2010, Zisa was indicted for charges relating to the 2008 and 2004 Allegations. Zisa's indictment contained nine counts, including allegations that he committed Official Misconduct (two counts pertaining to the 2004 Allegations and two counts pertaining to the 2008 Allegations), Conspiracy to Commit Official Misconduct (two counts, one pertaining to the 2004 Allegations and one pertaining to the 2008 Allegations), a Pattern of Official misconduct (regarding a combination of the 2004 and 2008 Allegations), Witness Tampering (relating to Herrmann's allegations about the alleged ride from the car dealership), and Insurance Fraud.

246.    Zisa and his ex-wife were not on good terms at the time of his arrest.  They had divorced before he was arrested in 2010. Haviland, Molina, and others arranged that Zisa had to surrender himself to his estranged ex-wife's cousin, Detective McMorrow, who then escorted him to the processing room where Zisa was photographed and fingerprinted.  Detective McMorrow's apparent satisfaction, evident throughout Zisa's arrest processing, added to the humiliation of his arrest, and speaks loudly to the personal and intentional nature of defendants' abuse of the criminal justice system to hurt Zisa.

10.     **Civil Lawsuits/Settlements**

247.    Ferraioli, Al-Ayoubi, Herrmann, and Campos all filed civil suits (collectively, the "Civil Lawsuits") against Zisa.

248.    The Civil Lawsuits were in furtherance of the conspiracy to harm Zisa. Specifically they made it difficult for Zisa to pursue the then-pending administrative charges against certain defendants, they pressured the City of Hackensack to take action against Zisa, and they served as a vehicle to forward ill-deserved "benefits" to Defendants.

249.    Notwithstanding Herrmann's demonstrably false claims levied against Zisa, upon information and belief the City of Hackensack paid a material sum to Herrmann to settle his civil lawsuit.

250.    Notwithstanding Campos' demonstrably false claims levied against Zisa, and notwithstanding Judge Martini dismissing certain counts pertaining to Zisa and labeling Campos' allegations "not plausible," upon information and belief the City of Hackensack paid a material sum to Campos to settle her civil lawsuit.

251.    Notwithstanding counsel for Ferraioli attempting, during the pendency of the administrative hearing against Ferraioli, to extort Zisa to drop the administrative charges, upon information and belief the City of Hackensack paid a material sum to Ferraioli to settle his civil lawsuit.

252.    Notwithstanding that Judge Wigenton concluded that reasonable suspicion existed for Zisa to approve a urine test to be conducted on Al-Ayoubi, notwithstanding a toxicology report showing that he ingested a dangerous and illegal steroid, and notwithstanding the City of Hackensack's knowledge that Al-Ayoubi was part of the "steroid culture", upon information and belief Al-Ayoubi's civil lawsuit was dismissed, Al-Ayoubi was restored to his position with a six

figure salary, and then retired early with pension benefits. He then went on to work security at the Garden State Plaza.

**11.**     **Immunity Deals**

253.     In furtherance of the conspiracy to harm Zisa, and to facilitate the furtherance of false claims against Zisa, Campos, Herrmann, and Al-Ayoubi were given full transactional immunity from criminal and administrative action by Keitel and Haviland.

254.     Campos, Herrmann, and Al-Ayoubi each admitted that they were given full immunity from both criminal and administrative action.

255.     Keitel admitted in a letter that the immunity agreements were not reduced to writing, claiming they were "informal." Rather, they were merely conveyed verbally to Campos, Herrmann, and Al-Ayoubi by Haviland.

256.     Letters sent by Attorney T to Keitel and Haviland describe the wide breadth of the immunity deals.  No responsive letters back from either Molinelli or Keitel ever were produced by Keitel.

257.     Although the immunity deals were clearly discussed with the witnesses, not a single note regarding those discussions was produced, outside of the letter that the Court directed Keitel to provide after he failed to produce any information on the immunity deals.

258.     The lack of meaningful, detailed information regarding the unlawful immunity deals limited Zisa's ability to confront these witnesses and denied Zisa procedural due process.

259.     By bestowing immunity on these key witnesses Keitel and defendant Haviland solicited knowingly false information protected their co-conspirators and specifically denied Zisa due process.

### 12.    **The Denial of Procedural Due Process/Severence**

260.    As previously noted, the indictment against Zisa was obtained by joining together two distinct events – the 2004 Allegations and the 2008 Allegations – separated by more than four years, and with no State witnesses in common.

261.    Through the joinder of these two unrelated events, the BCPO inappropriately sought to bolster each claim by effectively portraying Zisa's alleged criminal propensity.

262.    Zisa attempted to sever the indictment, and have separate trials for the 2004 Allegations and the 2008 Allegations.

263.    Keitel opposed Zisa's application to sever the claims.  Keitel argued instead to sever the claims against Zisa and KT from the claims against Aletta and Garcia.  By severing the defendants, Keitel effectively prevented Aletta and Garcia from being available to testify on Zisa's behalf as to the 2004 allegations.

264.    Ultimately, Zisa's application to sever the claims was denied.

265.    Keitel was aware that, in order to maintain the joinder of the 2004 and 2008 Allegations, the evidence must meet the "Cofield" standard.  See State v. Cofield, 127 N.J. 328 (1992).

266.     To do so, *inter alia*, each incident must have clear and convincing proofs on its own.  At the time that he opposed Zisa's application to sever the claim, Keitel was aware that probable cause did not exist with respect to the 2004 Allegations.

267.    Haviland admitted at trial that he and Keitel knew that Campos – the State's central witness with respect to the 2004 Allegations – was not telling the truth.

268.    Campos' lie was central to her testimony, and fatal to the State's 2004 Allegations.  In her initial sworn statement Campos did not implicate Zisa whatsoever; rather, she maintained

that Zisa was not at the police station at the relevant time.  It was only during a subsequent sworn statement to Haviland, after purportedly "reviewing her journals," that Campos' memory suddenly was "refreshed" in a manner that suddenly implicated Zisa.

269.     Notwithstanding full knowledge of Campos' lies, Keitel opposed Zisa's pre-trial application to sever claims by asserting that, while Campos was likely to face cross-examination on the issue, Campos was "a witness of many witnesses" and "one minor aspect of an entire incident where [his] witness list is three pages long."   Keitel went on to tell the jury during his opening, after identifying several witnesses – including Campos, "All of these witnesses will testify, they'll tell you what they saw.  I believe you will find them believable."  He went on later to say, "I believe when you hear all the testimony and see all the evidence, you'll be convinced they're telling the truth."

270.     Then during Zisa's trial defendant Haviland testified that he and Keitel knew that Campos was lying yet, astonishingly, they had decided not to do anything about it until after the Zisa trial.

271.     Had the Court not been misled about Campos's veracity, the 2004 Allegations and the 2008 Allegations would have minimally been severed, or appropriately dismissed.  Instead, Zisa's due process rights were violated, and Keitel was left to paint a false picture of criminal propensity.

### 13.     The Intentional Destruction of Evidence

272.     Also in furtherance of the conspiracy to harm Zisa, and to facilitate the furtherance of false claims against Zisa, the State knowingly and purposefully destroyed relevant and exculpatory evidence.

273.    On October 21, 2010 – a mere two (2) days after Zisa was indicted – and ***after*** counsel for Zisa specifically had requested the preservation of all relevant materials, Haviland sent an email to the case detectives instructing them to "Please get rid of what we do not need." The Subject line in the e-mail stated: Zisa.

274.    Haviland followed-up that email with multiple in-person demands that his case detectives destroy all of their notes and e-mails regarding the Zisa investigation.

275.    On May 1, 2012, Haviland testified at Zisa's criminal trial. Haviland identified Molina, Gary Robinson, Dave Rodgers and Bob Pasquariello as the four (4) BCPO detectives who did the majority of the interviews on the case besides himself.

276.    On May 8, 2012, Detectives Robinson, Rodgers and Pasquariello testified at Zisa's trial. All three detectives confirmed that they had personally worked on the investigation.

277.    Detective Pasquariello testified that at some point around the time of the indictment in the case – Zisa was indicted on October 19, 2010 – Haviland walked through the office of the CIU and instructed "everybody" to get rid of all of their notes and e-mails "on the Zisa case." Pasquariello admittedly thought that it was "peculiar" that they were told to shred their notes but he complied with the order.

278.    Detective Pasquariello testified that after taking their first statement at the beginning of the investigation, he expressed a concern to Haviland about the reliability of a witness, as well as having an issue with a witness's statement. Haviland told Detective Pasquariello that "it doesn't matter; the boss wants him charged." When Detective Pasquariello was then questioned by Zisa's counsel as to who was the "him" that Haviland was referring to, Pasquariello testified, "Chief Zisa." "The boss" was identified by Pasquariello to be Molinelli.

279.    Detective Rodgers testified that he was told by Haviland to get rid of his notes sometime around October 21, 2010. Detective Rodgers testified that after he complied with the order to get rid of his notes, he learned that a specific request had previously been made by the defense to preserve all notes.

280.    Detective Rodgers testified that this investigation was run differently than any one he ever worked on.  Detective Rodgers testified that "[i]n 40 years" he had never before received an instruction to destroy his notes in connection with an investigation.

281.    Detective Robinson testified that sometime in October of 2010, he was approached by Haviland who told him that they had been put on notice to retain everything from their investigation including their notes. Haviland then stated, "So get rid of everything you don't need and get rid of your notes."

282.     Detective Robinson testified that when he questioned Haviland's order, Haviland told him, "Just do it."

283.    Detective Robinson testified that Haviland said that he was "getting a burn box." Haviland left the room and returned with a box which he placed on a desk, and began putting items in it. Detective Robinson testified that Haviland instructed "everybody to get rid of their notes and everything you don't need."

284.    Contemporaneous notes were destroyed.  To date, other than the memo from Haviland described above relating to Campos's journals, and the Haviland memo concerning Al-Ayoubi's administrative charges being dismissed, no notes from Haviland were produced. No notes from the meetings with Wilks, Attorney T's investigator, were produced.  No notes of the immunity discussions were produced.

**14.    In Defiance of Court Instructions, During the Trial Both the Prosecutor and Witnesses Introduced Extraneous and Improper Allegations Against Zisa, <u>Materially Prejudicing Zisa</u>**

285.    The trial against Zisa commenced on April 3, 2012.

286.    Fully aware that the 2004 and 2008 Allegations both lacked merit, in order to avoid a public acquittal the BCPO and its witnesses intentionally goaded a mistrial and, in the process, inserted significant prejudice into the proceedings that ultimately resulted in an unfair trial and unjust verdict against Zisa.

287.    Keitel committed serious prosecutorial misconduct both during his opening and throughout the trial. *See* JNOV decision transcript by Judge Conte dated September 12, 2012, a copy of which is attached as Exhibit F, *See* in its entirety, and specifically pages 25 – 30.

288.    Motions *in limine* confirmed there were virtually no uncharged crimes or bad acts at issue for Zisa. During the trial Keitel improperly alleged that Zisa had intimidated virtually all of the main witnesses (Campos, Al-Ayoubi, Herrmann, and Arosemowicz) by causing them to have administrative issues because they were testifying against Zisa, and those witnesses in turn affirmatively tried to inject testimony supporting those false allegations before the jury.  They continued to do so despite repeated admonitions by the trial judge.

289.    Haviland admitted under oath that he and Keitel knew that Campos was not being truthful, but made the decision not to do anything about it until after the Zisa trial.

290.    The trial judge was forced to repeatedly admonish Keitel throughout the course of the trial.

291.    Other witnesses, including Campos, Herrmann, and Al-Ayoubi, also repeatedly and intentionally attempted to prejudice Zisa by blurting out excluded and highly prejudicial allegations.

292.     During the trial, there were five motions for a mistrial made by the defense, and none were granted.

293.     As noted by the trial judge following one of the mistrial motions, "It appears that Mr. Keitel's witnesses, even though this Court has instructed him to personally prepare them for trial, are very determined to get information out that's inappropriate for this trial.  They want to seem to try their own personal matter, notwithstanding what they're called to testify for." *See* August 23, 2016 of The Hon. Susan J. Steele, P.J.Crim, at p.42, a copy of which is attached as Exhibit G.

**15.     The Overwhelming Prejudice Caused by a Corrupt and Intentionally Dishonest Investigation, and Solicited and Protected False Testimony, Caused Zisa to Be Wrongly Convicted.**

294.     Ultimately, the jury found Zisa guilty of five (5) of the nine (9) counts against him, including counts pertaining to both the 2004 Allegations and the 2008 Allegations.

295.     Each conviction for Official Misconduct carried a 5-year mandatory prison sentence with no eligibility for parole.  With his convictions, Zisa was facing in excess of twenty (20) years in prison.

296.     The media on the verdict went national.  From that day forward, continuing presently, Zisa is referred to publically as the "disgraced former Hackensack Police Chief."  Public comments to media articles included such things as expressing hope that Zisa would be raped in jail.

**16.     Citing Baseless Allegations and Numerous Instances of Prosecutorial Misconduct, the Trial Judge Partially Grants Zisa's Motion for JNOV.**

297.     The trial judge, Judge Joseph Conte, granted Zisa's motion for JNOV for all of the convictions except for two counts – one count of Official Misconduct pertaining to the 2008 Allegations, and Insurance Fraud.  The trial judge cited to a complete lack of evidential support as

the basis for his dismissing the three convictions on the other counts.  *See* JNOV transcript Decision by Judge Conte, a copy of which is attached as Exhibit F.

298.    In overturning three of the jury's guilty verdicts, trial Judge Conte enumerated certain issues which were noteworthy to him.

299.    Judge Conte noted that one witness's calendar had been withheld from the defense for two years and that the calendar contradicted the official records of the HPD.

300.    Judge Conte noted that Detective Malvasia had repeated in both of her statements that Zisa did not request or do anything inappropriate regarding Campos' report, even after Malvasia was read her Miranda Rights during her second statement.

301.    Judge Conte noted the numerous inconsistencies in Campos' statements.

302.    Judge Conte noted that Haviland testified that he knew that Campos had not been truthful.

303.    Judge Conte noted contradictions in Herrmann's and Al-Ayoubi's testimony.

304.    Judge Conte noted that Campos, Herrmann, and Al-Ayoubi all had civil law suits against Zisa.

305.    Judge Conte noted that Zisa was impugned improperly to the extent that the prosecutor alleged that a member of the Sheriff's Office and Zisa's civil attorney acted together and sought to "package" and intimidate Arosemowicz, without any shred of proof.

306.    Judge Conte noted that three of Haviland's own detectives had testified that Haviland had ordered them to destroy their notes.

307.    Judge Conte noted that Detective Rodgers testified that the investigation of the plaintiff was different than others.

308.     At various points in his decision, Judge Conte disclosed certain determinations that he had made based on the evidence and which resulted in his decision to overturn the one guilty count in the 2004 Altercation.

309.     Judge Conte stated, "The Court finds that there isn't any evidence to establish that Mr. Zisa injected himself in the 2004 investigation."

310.     Judge Conte stated, "There is no evidence that Mr. Zisa directed anyone to do anything [with respect to the 2004 Allegations."

311.     Judge Conte stated, "There's no grounds to infer that Mr. Zisa injected himself into the investigation."

**17.     Sentencing/Aftermath**

312.     Keitel initially stated that the State would be requesting Zisa to be sentenced to twenty-one (21) years in prison, with thirteen (13) years of parole ineligibility.  After the JNOV was granted, at sentencing, the State requested that Zisa be sentenced to thirteen (13) years in prison, with five (5) years of parole ineligibility.

313.     Zisa was sentenced to five (5) years in prison with five (5) years of parole ineligibility.  Pending his appeal, Zisa was confined to his home on bail with ankle monitoring. Ultimately, Zisa was confined in his home for thirty-four (34) months.

314.     On the occasions that Zisa was permitted to go get groceries, he was photographed and it was uploaded to a public blog.  He was taunted and ridiculed.

315.     During this time, Zisa suffered profound emotional distress and humiliation.

316.     After Zisa's trial, even after the unprecedented granting of a motion for JNOV, and while Zisa was subjected to home confinement, Molinelli awarded Keitel for going above and beyond the call of duty in regard to his work on the Zisa prosecution.  *See* copy of award, a copy

of which is attached as Exhibit H.  This award was presented in front of the all of the employees and guests at the BCPO holiday party.

317.    Both of Zisa's parents passed away while he was under indictment, with his criminal charges mentioned by the media in his mother's obituary.

318.    During the nearly three years that Zisa was confined to his home, both of his adult children were married.  They both felt compelled to have private ceremonies due to their father's confinement.

319.    To this day, Zisa is subjected to public humiliation and ridicule because of this malicious prosecution, which has forever and irreparably destroyed his reputation.  To date, Zisa's name is synonymous with criminality because of the vast media coverage of his prosecution and trial.

320.    Herrmann went on to be elected the president of the HPD PBA, after Ferraioli was terminated following a criminal conviction.

**18.    Zisa's Successful Appeal**

321.    After appeals were heard on behalf of both the State and Zisa, the Appellate Division affirmed the dismissals resulting from the granting of the JNOV, directed a Judgment of Acquittal be entered on the count of Insurance Fraud because there was no evidence supporting it, reversed and remanded the count of Official Misconduct relating to the 2008 Allegations, and included language inviting double jeopardy and other motions to be made below.  See State v. Zisa, No. A-0653-12T4, 2015 N.J. Super. Unpub. LEXIS 1842 (App. Div. July 31, 2015).

322.    In rendering its opinion, the Appellate Division cited to the "significant weaknesses" in the charges against Zisa, as well as numerous instances of perjury and misconduct:

> A brief summary will suffice to put the issues in this case in perspective. In 2010, the Bergen County Prosecutor's Office (State) charged defendant, who at the time

was the Hackensack Police Chief, with crimes relating to events that occurred in 2004 and 2008. The allegations against defendant did not come to light until 2010, and they arose in this context. In late January 2010, Hackensack's Labor Counsel wrote a letter to the Bergen County Prosecutor stating that allegations of official misconduct against defendant, Hackensack's Chief of Police since 1995, had arisen during a departmental disciplinary hearing involving Hackensack Police Officer Anthony Ferraioli, who also was president of the local police union. Defendant had filed those administrative charges against Ferraioli. In February 2010, the attorney who represented Ferraioli at the disciplinary hearing wrote the prosecutor a similar letter. That attorney also represented two of the witnesses who would later appear at defendant's 2012 trial, Patrol Officers Joseph Al–Ayoubi and John Herrmann.

According to Raymond Wiss, counsel to the departmental hearing officer, during a break in the disciplinary hearing, Ferraioli's attorney had told Wiss and others that he had information from Al–Ayoubi and Herrmann about an inaccurate police report and some alleged wrongdoing by defendant. The attorney said that he would not disclose that report to the press or to the Bergen County Prosecutor's Office if defendant agreed to dismiss the disciplinary charges against Ferraioli. Wiss testified that defendant had refused the deal, and Ferraioli's disciplinary hearing continued.

After receiving the two letters, the Prosecutor's Office began an investigation into defendant's actions in 2004 and 2008, which eventually led to an indictment.

The State alleged that in 2004, defendant interfered in a criminal investigation of his live-in girlfriend's son, who was a juvenile. The State also alleged that in 2008, defendant interfered in the investigation of an incident in which the girlfriend, K.T., was involved in a one-car accident while, allegedly, driving under the influence of alcohol. According to Officers Al–Ayoubi and Herrmann, K.T. was visibly intoxicated, but defendant came to the accident scene and whisked her away in his car before they could test her for intoxication. The witnesses asserted that defendant also stated to them that K.T. must have swerved to avoid an animal in the roadway, and they wrote their police reports to conform to what they believed he wanted them to say. The State further alleged that defendant and K.T. committed insurance fraud with respect to that incident.

There were significant weaknesses in the State's case. The 2004 allegations were based on an incident that was resolved to the satisfaction of the victim and his family after they received restitution. The State did not present any legally competent direct evidence that defendant influenced the way the police handled the case. Essentially, the State's case was that defendant and K.T. came to police headquarters after her minor son was brought there on suspicion of being involved in beating up another teenager; one or more supervising police officers told a subordinate to remove K.T.'s son's name from her police report; and defendant appeared at headquarters the next day when the police were questioning the son.

There was no testimony from any police officer that defendant told anyone to change a police report or told anyone else to have the report changed, or that he otherwise interfered in the processing of the case. The son came to police headquarters the day after the incident, received *Miranda* warnings, and gave a statement admitting to his involvement in the incident. All of that was documented in police records.

Officer Campos, one of the central police witnesses in the 2004 incident, destroyed a journal that she claimed contained notations about the day she allegedly saw defendant at the police station. She then, admittedly, lied to the Prosecutor's Office and to a Superior Court judge about the journal's continued existence and claimed to have consulted the journal long after she had destroyed it. She also changed her story several times about which of her superior officers allegedly told her to delete the son's name from the initial police report about the incident. Not surprisingly, Campos, whom the State presented as a key witness respecting the 2004 incident, was savaged on cross-examination. A dispatcher, Mr. Connolly, the State's other witness to defendant's alleged presence at the police station on the night of the 2004 incident, was also significantly impeached on cross-examination.

Respecting the 2008 charges, none of the contemporaneous reports filed by any of the three involved law enforcement officers, including Sheriff's Officer Arosemowicz who arrived first on the scene and did not work for defendant, reflected that K.T. was intoxicated at the time of the 2008 accident. None of the key police witnesses in either matter came forward with their incriminating information about defendant until after they had filed civil suits against him arising out of unrelated disciplinary matters. Arosemowicz was active in the PBA, whose president was the subject of the 2010 disciplinary hearing. On cross-examination, Arosemowicz admitted having numerous telephone conversations with Herrmann about the case against defendant, although he claimed to have no relationship with Herrmann.

During the defense case, three retired former Prosecutor's detectives testified that the lead investigator on the case had directed them to destroy their handwritten investigation notes after defense counsel had filed a demand that all notes be preserved.

See State v. Zisa, supra, 2015 N.J. Super. Unpub. LEXIS 1842, at *1-2; *See* Exhibit A, pages 3-8.

323.    Regarding the 2004 Allegations, the Appellate Division's opinion stated:

The trial evidence indicated that the son and the victim had a dispute over a girl they both knew. During the incident, one of the son's friends punched the victim in the mouth and knocked out a tooth. The victim declined to cooperate with the police, and he and his family declined to file a criminal complaint. The parents of

the three teenage perpetrators, including K.T.'s mother, paid restitution to the victim's father for $3000 in dental expenses.

See State v. Zisa, supra, 2015 N.J. Super. Unpub. LEXIS 1842, at fn.4; See Exhibit A, page 9.

324.    In regard to the 2008 Allegations, the Appellate Division's opinion states, "The defense presented significant evidence casting doubt on whether Herrmann was even present at the accident scene."  See State v. Zisa, supra, 2015 N.J. Super. Unpub. LEXIS 1842, at fn.7.

325.    The Appellate Division's opinion also noted and criticized the highly improper and prejudicial aspects of the prosecution's conduct during the trial.

326.    The decision describes Keitel's opening as being "riddled with impropriety." See State v. Zisa, supra, 2015 N.J. Super. Unpub. LEXIS 1842 at *12; See Exhibit A at page 12.

327.    The Appellate Division described Keitel's "astonishingly improper remarks" during his opening as follows:

> The prosecutor began by giving the jury extensive inadmissible information about defendant's family and their political activities. In that connection, the prosecutor essentially told the jury that defendant's family was like royalty who thought they were above the law, but they were not. All of those comments were improper and prejudicial. Defendant was not on trial for being politically connected, and his family was not on trial.
>
> The prosecutor then set forth a litany of alleged bad acts, all of which were inadmissible under N.J.R.E. 404(b) and were highly prejudicial. See State v. Cofield, 127 N.J. 328, 336 (1992). He repeatedly accused defendant of attempting to intimidate witnesses and fomenting administrative reprisals against witnesses in the case. Defendant was indicted with witness tampering as to one witness, John Herrmann. That event allegedly occurred in 2008. Defendant was not charged with tampering with any other witness. Nor was he charged with official misconduct with respect to any of the alleged events the prosecutor described in his opening statement.
>
> However, the prosecutor injected accusations that defendant tampered with several other witnesses and implied that defendant abused his office by arranging for unjustified administrative disciplinary actions to be filed against trial witnesses. He implied that defendant was responsible for, among other things, one of the witnesses, Officer Campos, having to retire early and losing her health insurance

and other witnesses losing pension benefits. Defendant was not charged with any of that conduct. All of those references to extraneous administrative proceedings were improper. See State v. Jackson, 211 N.J. 394, 412 (2012).

The prosecutor also made unfavorable, inappropriate comments about an attorney who was representing defendant in civil litigation filed by several of the State's witnesses, and posited that the attorney arranged with a high-ranking officer in the sheriff's department, Captain Bradley, to have disciplinary charges filed against Arosemowicz. He also strongly implied to the jury that there was an omnibus conspiracy among various county and municipal law enforcement agencies to assist defendant and persecute the witnesses against him.

Those astonishingly improper remarks were not brief or made in passing. They were central themes of the prosecutor's opening, and comprised many pages of the transcript.

See State v. Zisa, supra, 2015 N.J. Super. Unpub. LEXIS 1842, at *12-14; See Exhibit A at pages 12-14.

328.    Indeed, the Appellate Division believed it necessary to conclude its decision by noting what should be obvious to all: "Lastly, we remind all concerned that the primary duty of a prosecutor is not to obtain convictions, but to see that justice is done." See State v. Zisa, supra, 2015 N.J. Super. Unpub. LEXIS 1842 at *39; See Exhibit A, page 38.

**19.    Zisa's Ultimately Prevails on Remand.**

329.    On August 23, 2016, Zisa's indictment was dismissed based on both grounds.  In so ruling, Judge Steele cited to the State's weak and questionable evidence provided by biased witnesses, as well as numerous instances of misconduct on the part of the State.

330.    In her 110-page decision, Judge Steele, the Bergen County Criminal Presiding Judge, stated:

Considering the **State's lack of proofs** and the **weaknesses of its case,** it is **surprising this case was prosecuted to begin with**.  Looking to the trial itself, it is equally surprising a mistrial was not ordered at any point.  The court is not charged with venturing to guess why the charges were not dismissed or why a mistrial was not called.

<u>See</u> August 23, 2016 of The Hon. Susan J. Steele, P.J.Crim, at p.105, a copy of which is attached as Exhibit G. (Emphasis added.)

331.   The above powerful words should have been answered with an investigation into the conduct of all of the defendants.

332.   Judge Steele's decision went on to state:

The court finds **the State vaulted the threshold of prosecutorial misconduct to goad defendant to seek a mistrial not once, but repeatedly, five times**…. It is unequivocal, the record is rife with repeated attempts by the State to goad defendant from the outset and by blatantly refusing to heed the admonishments of the court thereafter…. A careful scrutiny of the record **shocks the conscience** and can leave this court with no other conclusion.

As strikingly noted by the Appellate Division, "Lastly, we remind all concerned that the primary duty of a prosecutor is not to obtain convictions, but to see that justice is done."" Zisa at 39. That was not done here and for that reason defendant's motion is granted. The sole pending count is dismissed with prejudice."

<u>Id.</u> at p.108-09. (emphasis added)

333.   The State, by then under the direction of a new Bergen County Prosecutor, did not appeal.

334.   The time for an appeal has now expired.

335.   Notices of Claim were timely served on October 23, 2015, advising both the City of Hackensack, and the County of Bergen of potential claims, pursuant to Title 59.

**20.   The City of Hackensack Concedes that There Is "No Credible Evidence" to Support Administrative Charges Against Zisa, and that "to Do So Would Be In Bad Faith"**

336.   Following the dismissal of the indictment with prejudice, the City of Hackensack entered into a Payment Agreement and Release. Pursuant to that Agreement, and as required by statute, Zisa was repaid his back pay relating to his suspension based on his unwarranted arrest and indictment. Notably, the City of Hackensack conceded that there exists "no credible evidence"

to support administrative charges against Zisa, and that it would be in "bad faith" to pursue such administrative charges. In pertinent part, the Payment Agreement and Release states:

> <u>Administrative Charges</u>. Based upon a review of the record, including the Opinion of the Superior Court of New Jersey, Appellate Division, and Docket No. A-0653-12T4, and the Order and Opinion of Hon. Susan J. Steele, P.J.Cr., dated August 23, 2016, the City Manager as the Appropriate Authority has determined that it is in the best interests of the City not to pursue administrative charges against Zisa, and that **to do so would be in bad faith**, the City agrees to dismiss and not pursue any and all disciplinary charges, administrative hearings, open investigations, if any, against Zisa. These charges, if any, shall be withdrawn and dismissed, and closed with prejudice, and all records thereof removed from his official file. Such dismissal is within the scope of the authority of the City Manager, and same is being dismissed pursuant to such authority under NJSA §40:79-1 et seq., specifically because **there is no credible evidence to support them**.

(Emphasis added.)

337.    Zisa was maliciously prosecuted, deprived of a fair trial, denied due process, and suffered violation of his Fourth Amendment rights while he was confined to his house. But for the conspiracy by the defendants to deprive Zisa of his civil rights, this malicious prosecution would and could not have occurred.

338.    Under the circumstances described above, the defendants do not have qualified immunity.

339.    The depravity, brazenness, illegality, abuse of the criminal justice system, abuse of office, abuse of power, and corruption demonstrated by these defendants calls for the harshest civil penalties to be imposed.

## COUNT I

### Violation of Civil Rights Pursuant to 42 U.S.C. § 1983
### Denial of a Fair Trial (6th Amendment) – All Defendants

340.    Zisa hereby incorporates all of the preceding allegations and make them a part of this Count as if fully set forth herein.

341.     Defendants at all times acted under color of state law.

342.     Defendants, in their individual and official capacities, acting alone and in concert, engaged in misconduct before and during trial which deprived Zisa of his right to a fair trial under the Sixth Amendment.

343.     Defendants suborned and solicited perjury, offered illegal immunity deals in order to solicit perjured testimony, protected the perjurers from administrative charges, knowingly presented false and fabricated evidence to the Grand Jury and to the court before and during trial, presented false evidence in order to prevent the court from granting Zisa's meritorious motion for severance, destroyed exculpatory evidence, knowingly pursued baseless claims against Zisa, and engaged in egregious trial misconduct.

344.     The unfairness created by Defendants' conduct was so patent and severe that Judge Steele held that retrial on the last remaining charge was barred not only by double jeopardy principles, but also by "principles of fundamental fairness."

345.     As a result of the unfairness created by Defendants' conduct, Zisa was convicted of charges relating to the 2004 and 2008 Allegations, and of a charge relating to an overall pattern of misconduct.

346.     Zisa's convictions ultimately were either overturned with judgement entered in Zisa's favor, or dismissed with prejudice, but this was only after Zisa suffered nearly three years of home confinement, the complete destruction of his reputation, and financial ruin.

347.     Zisa's rights under the Sixth Amendment were clearly established such that any reasonable person would be aware of them. It was not reasonable for Defendants to believe that their actions did not violate Zisa's constitutional rights under the Sixth Amendment.

348.    As a direct result of Defendants' violation of Zisa's constitutional rights, Zisa has suffered loss of liberty, damage to his reputation, mental anguish, emotional distress, embarrassment, humiliation and financial loss, all in extraordinary amounts, and is entitled to relief under 42 U.S.C. § 1983.

349.    Defendants acted maliciously, willfully, and wantonly in violating Zisa's federally protected rights.

## COUNT II

**Violation of Civil Rights Pursuant to N.J.S.A. § 10:6-1 *et seq.***
**Denial of a Fair Trial - All Defendants**

350.    Zisa hereby incorporates all of the preceding allegations and make them a part of this Count as if fully set forth herein.

351.    Defendants at all times acted under color of state law and were acting within the scope of their responsibilities.

352.    Defendants, in their individual and official capacities, acting alone and in concert, engaged in misconduct before and during trial which deprived Zisa of his right to a fair trial under the New Jersey Constitution, including but not limited to Article I.

353.    Defendants suborned and solicited perjury, offered illegal immunity deals in order to solicit perjured testimony, protected the perjurers from administrative charges, knowingly presented false and fabricated evidence to the Grand Jury and to the court before and during trial, presented false evidence in order to prevent the court from granting Zisa's meritorious motion for severance, destroyed exculpatory evidence, knowingly pursued baseless claims against Zisa, and engaged in egregious trial misconduct.

354.     As a result of the unfairness created by Defendants' conduct, Zisa was convicted of charges relating to the 2004 and 2008 Allegations, and of a charge relating to an overall pattern of misconduct.

355.     Zisa's convictions ultimately were either overturned with judgement entered in Zisa's favor, or dismissed with prejudice, but this was only after Zisa suffered nearly three years of home confinement, the complete destruction of his reputation, and financial ruin.

356.     Zisa's rights under the New Jersey Constitution were clearly established such that any reasonable person would be aware of them. It was not reasonable for Defendants to believe that their actions did not violate Zisa's rights under the New Jersey Constitution.

357.     As a direct result of Defendants' violation of Zisa's rights, Zisa has suffered loss of liberty, damage to his reputation, mental anguish, emotional distress, embarrassment, humiliation and financial loss; all in extraordinary amounts, and is entitled to relief under N.J.S.A. § 6:10-2.

358.     Defendants acted maliciously, willfully, and wantonly in violating Zisa's rights.

## COUNT III

**Violation of Civil Rights Pursuant to 42 U.S.C. § 1983**
**Malicious Prosecution and Conspiracy to Commit Malicious Prosecution (4th and 14th**
**Amendments) – All Defendants**

359.     Zisa hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

360.     Defendants at all times acted under color of state law.

361.     Defendants, in their individual and official capacities, acting alone and in concert, agreed to engage in and engaged in misconduct amounting to a malicious prosecution depriving Zisa of his rights as a citizen of the United States under the Fourth and Fourteenth Amendments to the Constitution of the United States.

362.    The criminal proceedings against Zisa terminated in Zisa's favor.

363.    Defendants acted maliciously and for purposes other than bringing Zisa to justice.

364.    As a result of Defendants' misconduct, Zisa suffered a severe deprivation of his liberty.

365.    Zisa's rights under the Fourth and Fourteenth Amendments were clearly established such that any reasonable person would be aware of them. It was not reasonable for Defendants to believe that their actions did not violate Zisa's constitutional rights under the Fourth and Fourteenth Amendments.

366.    As a direct result of Defendants' violation of Zisa's constitutional rights, Zisa has suffered loss of liberty, damage to his reputation, mental anguish, emotional distress, embarrassment, humiliation and financial loss; all in extraordinary amounts, and is entitled to relief under 42 U.S.C. § 1983.

367.    Defendants acted maliciously, willfully, and wantonly in violating Zisa's federally protected rights.

## **COUNT IV**

**Violation of Civil Rights Pursuant to N.J.S.A. § 10:6-1 *et seq.***
**Malicious Prosecution and Conspiracy to Commit Malicious Prosecution – All Defendants**

368.    Zisa hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

369.    Defendants at all times acted under color of state law and were acting within the scope of their responsibilities.

370.    The defendants, in their individual and official capacities, acting alone and in concert, agreed to engage in and engaged in misconduct amounting to a malicious prosecution

depriving Zisa of his rights under the New Jersey Constitution, including but not limited to Article I.

371.     The criminal proceedings against Zisa terminated in Zisa's favor.

372.     Defendants acted maliciously and for purposes other than bringing Zisa to justice.

373.     As a result of Defendants' misconduct, Zisa suffered a severe deprivation of his liberty.

374.     Zisa's rights under the New Jersey Constitution were clearly established such that any reasonable person would be aware of them. It was not reasonable for Defendants to believe that their actions did not violate Zisa's rights under the New Jersey Constitution, including but not limited to Article I.

375.     As a direct result of Defendants' violation of Zisa's rights, Zisa has suffered loss of liberty, damage to his reputation, mental anguish, emotional distress, embarrassment, humiliation and financial loss; all in extraordinary amounts, and is entitled to relief under N.J.S.A. § 10:6-2.

376.     Defendants acted maliciously, willfully, and wantonly in violating Zisa's rights.

## COUNT V

### Common Law Malicious Prosecution – All Defendants

377.     Zisa hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

378.     Defendants, acting alone and in concert, initiated criminal proceedings against Zisa without probable cause to support such proceedings.

379.     Defendants were motivated by malice.

380.     The criminal proceedings against Zisa terminated in Zisa's favor.

381.    Zisa's rights under New Jersey common law were clearly established such that any reasonable person would be aware of them. It was not reasonable for Defendants to believe that their actions and omissions did not violate Zisa's clearly established rights.

382.    As a direct result of Defendants' violation of Zisa's rights, Zisa suffered loss of liberty, damage to his reputation, mental anguish, emotional distress, embarrassment, humiliation and financial loss; all in extraordinary amounts, and is entitled to relief under New Jersey common law.

383.    Defendants acted maliciously, willfully, and wantonly in violating Zisa's rights.

## COUNT VI

**Violation of Civil Rights Pursuant to 42 U.S.C. § 1983**
**Malicious Prosecution - Destruction of Exculpatory Evidence - Defendant Haviland**

384.    Zisa hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

385.    Defendant Haviland at all times acted under color of state law.

386.    Haviland's misconduct constituting malicious prosecution in violation of Zisa's rights included, but was not limited to, the purposeful destruction of relevant and exculpatory evidence at Haviland's direction despite a preservation request from Zisa.

387.    The destruction of relevant evidence irreparably prejudiced Zisa.

388.    Zisa's rights under the Fourth and Fourteenth Amendments were clearly established such that any reasonable person would be aware of them. It was not reasonable for Haviland to believe that their actions did not violate Zisa's constitutional rights under the Fourth and Fourteenth Amendments.

389.    As a direct result of Haviland's violation of Zisa's constitutional rights, Zisa has suffered loss of liberty, damage to his reputation, mental anguish, emotional distress,

embarrassment, humiliation and financial loss; all in extraordinary amounts, and is entitled to relief under 42 U.S.C. § 1983.

390.     Haviland acted maliciously, willfully, and wantonly in violating Zisa's federally protected rights.

## COUNT VII

### Violation of Civil Rights Pursuant to N.J.S.A. § 6:10-1 *et seq.*
### Malicious Prosecution - Destruction of Exculpatory Evidence - Defendant Haviland

391.     Zisa hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

392.     Haviland at all times acted under color of state law, and was acting within the scope of his responsibilities.

393.     Haviland's misconduct constituting malicious prosecution in violation of Zisa's rights included, but was not limited to, the purposeful destruction of relevant and exculpatory evidence at Haviland's direction despite a preservation request from Zisa.

394.     The destruction of relevant evidence irreparably prejudiced Zisa.

395.     Zisa's rights under the New Jersey Constitution were clearly established such that any reasonable person would be aware of them. It was not reasonable for Haviland to believe that his actions did not violate Zisa's constitutional rights under the New Jersey Constitution.

396.     As a direct result of Haviland's violation of Zisa's rights, Zisa has suffered loss of liberty, damage to his reputation, mental anguish, emotional distress, embarrassment, humiliation and financial loss; all in extraordinary amounts, and is entitled to relief under N.J.S.A. § 6:10-2.

397.     Haviland acted maliciously, willfully, and wantonly in violating Zisa's rights.

## COUNT VIII

**Violation of Civil Rights Pursuant to 42 U.S.C. § 1983**
**Failure to Supervise/ Intervene - Defendants Lo Iacono, Padilla, Haviland, Condon, City of Hackensack, County of Bergen, and BCPO**

398.    Zisa hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

399.    Lo Iacono, Padilla, Haviland, Condon, City of Hackensack, County of Bergen, and BCPO, at all times acted under color of state law.

400.    Lo Iacono, Padilla, Haviland, Condon (in their individual and official capacities), the City of Hackensack, County of Bergen, and BCPO, engaged in misconduct which constituted failure to supervise others and failure to intervene, resulting in the deprivation of Zisa's rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments.

401.    The BCPO took over the administrative functions of the HPD, including but not limited to the HPD's Internal Affairs Unit, via the MOU between itself and the City of Hackensack, and did so as part of, and in furtherance of, *inter alia*, the illegal immunity deals entered into with Al-Ayoubi, Herrmann, and Campos, for the protection and benefit of certain defendants, including but limited to, Al-Ayoubi, Herrmann, and Campos in regard to administrative charges, and to facilitate the BCPO to solicit false testimony against Zisa.

402.    Lo Iacono, Padilla, Haviland, Condon, City of Hackensack, County of Bergen, and BCPO further turned a blind eye on the misconduct of several BCPO and HPD employees, and failed to hold them accountable for their misconduct, false statements and false evidence incriminating Zisa, which led to Zisa's conviction (Haviland and Condon had roles as both supervisors and subordinates).

403.     Upon information and belief, Lo Iacono, Padilla, Haviland, Condon, City of Hackensack, County of Bergen, and BCPO, each directed their subordinates (Al-Ayoubi, Herrmann, Ferraioli, Campos, Haviland, Condon, and Molina) to take the actions described above.

404.     Upon information and belief Lo Iacono, Padilla, Haviland, Condon, City of Hackensack, County of Bergen, and BCPO had actual knowledge of their subordinates' conduct (Al-Ayoubi, Herrmann, Ferraioli, Campos, Haviland, Condon, and Molina) described above and the resulting violations of Zisa's rights and acquiesced in those violations by their inaction.

405.     Lo Iacono, Padilla, Haviland, Condon, City of Hackensack, County of Bergen, and BCPO, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the conduct of their subordinates (Al-Ayoubi, Herrmann, Ferraioli, Campos, Haviland, Condon, and Molina) described above and the resulting violations of Zisa's rights.

406.     As described above, Al-Ayoubi, Herrmann, Ferraioli, Campos, Haviland, Condon, and Molina violated Zisa's rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments.

407.     Lo Iacono, Padilla, Haviland, Condon, City of Hackensack, County of Bergen, and BCPO each had a duty to intervene.  Lo Iacono had a duty to intervene as the Manager of the City of Hackensack.  Padilla had a duty to intervene as the HPD Acting Officer in Charge.  Haviland had a duty to intervene as the BCPO lead detective and supervisor of the HPD following the Supersession.  Condon had a duty to intervene as the Monitor of the HPD following the Supersession.

408.     Yet, Lo Iacono, Padilla, Haviland, Condon, the BCPO, the County of Bergen, and the City of Hackensack failed to intervene.

409.    Zisa's rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments were clearly established such that any reasonable person would be aware of them. It was not reasonable for Lo Iacono and Padilla to believe that their actions and omissions did not violate Zisa's constitutional rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments.

410.    As a direct result of Defendants' violation of Zisa's constitutional rights, Zisa has suffered loss of liberty, damage to his reputation, mental anguish, emotional distress, embarrassment, humiliation and financial loss; all in extraordinary amounts, and is entitled to relief under 42 U.S.C. § 1983.

411.    Lo Iacono, Padilla, Haviland, Condon, City of Hackensack, County of Bergen and BCPO acted maliciously, willfully, and wantonly in violating Zisa's federally protected rights.

## COUNT IX

### Violation of Civil Rights Pursuant to N.J.S.A. § 6:10-1 *et seq.*
### Failure to Supervise/ Intervene - Defendants Lo Iacono (in His Individual and Official Capacities), Padilla (in His Individual and Official Capacity), City of Hackensack, BCPO

412.    Zisa hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

413.    Lo Iacono, Padilla, Haviland, Condon, City of Hackensack, County of Bergen, and BCPO, at all times acted under color of state law.

414.    Lo Iacono, Padilla, Haviland, Condon (in their individual and official capacities), the City of Hackensack, County of Bergen, and BCPO, engaged in misconduct which constituted failure to supervise others and failure to intervene, resulting in the deprivation of Zisa's rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments.

415.    The BCPO took over the administrative functions of the HPD, including but not limited to the HPD's Internal Affairs Unit, via the MOU between the City of Hackensack, and did so as part of, and in furtherance of, *inter alia*, the illegal immunity deals entered into with Al-

Ayoubi, Herrmann, and Campos, for the protection and benefit of certain defendants, including but not limited to, Al-Ayoubi, Herrmann, and Campos, in regard to administrative charges, and to facilitate the BCPO to solicit false testimony against Zisa

416.    Lo Iacono, Padilla, Haviland, Condon, City of Hackensack, County of Bergen, and BCPO, further turned a blind eye on the misconduct of several BCPO and HPD employees, and failed to hold them accountable for their misconduct, false statements and false evidence incriminating Zisa, which led to Zisa's conviction (Haviland and Condon had roles as both supervisors and subordinates).

417.    Upon information and belief, Lo Iacono, Padilla, Haviland, Condon, City of Hackensack, County of Bergen, and BCPO, each directed their subordinates (Al-Ayoubi, Herrmann, Ferraioli, Campos, Haviland, Condon, and Molina) to take the actions described above.

418.    Upon information and belief Lo Iacono, Padilla, Haviland, Condon, City of Hackensack, County of Bergen, and BCPO had actual knowledge of their subordinates' conduct (Al-Ayoubi, Herrmann, Ferraioli, Campos, Haviland, Condon, and Molina) described above and the resulting violations of Zisa's rights and acquiesced in those violations by their inaction.

419.    Lo Iacono, Padilla, Haviland, Condon, City of Hackensack, County of Bergen, and BCPO, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the conduct of their subordinates (Al-Ayoubi, Herrmann, Ferraioli, Campos, Haviland, Condon, and Molina) described above and the resulting violations of Zisa's rights.

420.    As described above, Al-Ayoubi, Herrmann, Ferraioli, Campos, Haviland, Condon, and Molina violated Zisa's rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments.

421.    Lo Iacono, Padilla, Haviland, Condon, City of Hackensack, County of Bergen, and BCPO each had a duty to intervene.  Lo Iacono had a duty to intervene as the Manager of the City of Hackensack.  Padilla had a duty to intervene as the HPD Acting Officer in Charge.  Haviland had a duty to intervene as the BCPO lead detective and supervisor of the HPD following the Supersession.  Condon had a duty to intervene as the Monitor of the HPD following the Supersession.

422.    Yet, Lo Iacono, Padilla, Haviland, Condon, BCPO, and the County of Bergen, and the City of Hackensack failed to intervene.

423.    Zisa's rights under the Fourth, Sixth, and Fourteenth Amendments were clearly established such that any reasonable person would be aware of them. It was not reasonable for Lo Iacono and Padilla to believe that their actions and omissions did not violate Zisa's constitutional rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments.

424.    As a direct result of Defendants' violation of Zisa's constitutional rights, Zisa has suffered loss of liberty, damage to his reputation, mental anguish, emotional distress, embarrassment, humiliation and financial loss; all in extraordinary amounts, and is entitled to relief under 42 U.S.C. § 1983.

425.    Lo Iacono, Padilla, Haviland, Condon, City of Hackensack, County of Bergen and BCPO, acted maliciously, willfully, and wantonly in violating Zisa's federally protected rights.

### COUNT X

**Violation of Civil Rights Pursuant to 42 U.S.C. § 1983**
**Fabrication of Evidence (14th Amendment) - Defendants Haviland, Herrmann, Campos, Arosemowicz, Al-Ayoubi, and Molina**

426.    Zisa hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

- 75 -

427.    Haviland, Herrmann, Campos, Arosemowicz, Al-Ayoubi, and Molina at all times acted under color of state law.

428.    As described above, Haviland, Herrmann, Campos, Arosemowicz, Al-Ayoubi, and Molina, in their individual and official capacities, acting alone and in concert, engaged in the fabrication of evidence in violation of Zisa's rights under the Fourteenth Amendment.

429.    As described above, Zisa was convicted after trial of charges relating to both the 2004 and the 2008 Allegations, based on fabricated evidence.

430.    Zisa would not have been convicted had the fabricated evidence not been presented at trial. In fact, Zisa could not have been convicted without the above described fabricated evidence.

431.    Zisa's rights under the Fourteenth Amendment were clearly established such that any reasonable person would be aware of them. It was not reasonable for Haviland, Herrmann, Campos, Arosemowicz, Al-Ayoubi, and Molina to believe that their actions and omissions did not violate Zisa's constitutional rights under the Fourteenth Amendment.

432.    As a direct result of Defendants' violation of Zisa's constitutional rights, Zisa has suffered loss of liberty, damage to his reputation, mental anguish, emotional distress, embarrassment, humiliation and financial loss, all in extraordinary amounts, and is entitled to relief under 42 U.S.C. § 1983.

433.    Haviland, Herrmann, Campos, Arosemowicz, Al-Ayoubi, and Molina, acted maliciously, willfully, and wantonly in violating Zisa's federally protected rights.

## COUNT XI

**Violation of Civil Rights Pursuant to N.J.S.A. § 6:10-1 *et seq.*
Fabrication of Evidence - Defendants Haviland, Herrmann, Campos, Al-Ayoubi,
Arosemowicz, and Molina**

434.     Zisa hereby incorporates all of the preceding allegations and makes them a part of
this Count as if fully set forth herein.

435.     Haviland, Herrmann, Campos, Al-Ayoubi, Arosemowicz, and Molina, at all times
acted under color of state law, and were acting within the scope of their responsibilites.

436.     As described above, Haviland, Herrmann, Campos, Al-Ayoubi, Arosemowicz, and
Molina, in their individual and official capacities, acting alone and in concert, engaged in the
fabrication of evidence in violation of Zisa's rights and due process afforded under the New Jersey
Constitution.

437.     As described above, Zisa was convicted after trial of charges relating to both the
2004 and the 2008 Allegations, based on fabricated evidence.

438.     Zisa would not have been convicted had the fabricated evidence not been presented
at trial. In fact, Zisa could not have been convicted without the above described fabricated
evidence.

439.     Zisa's rights under the New Jersey Constitution were clearly established such that
any reasonable person would be aware of them. It was not reasonable for Haviland, Herrmann,
Campos, Al-Ayoubi, Arosemowicz, and Molina, to believe that their actions and omissions did
not violate Zisa's rights under the New Jersey Constitution.

440.     As a direct result of Defendants' violation of Zisa's constitutional rights, Zisa has
suffered loss of liberty, damage to his reputation, mental anguish, emotional distress,

embarrassment, humiliation and financial loss; all in extraordinary amounts, and is entitled to relief under N.J.S.A. § 10:6-2.

441.    Haviland, Herrmann, Campos, Al-Ayoubi, Arosemowicz, and Molina, acted maliciously, willfully, and wantonly in violating Zisa's rights.

## COUNT XII

### Violation of Civil Rights Pursuant to 42 U.S.C. § 1983
### Deprivation of Substantive Due Process – All Defendants

442.    Zisa hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

443.    Defendants at all times acted under color of state law.

444.    Defendants, in their individual and official capacities, acting alone and in concert, engaged in conduct that shocks the conscience and deprived Zisa of interests protected by the Fifth and Fourteenth Amendments, resulting in the violation of Zisa's rights to substantive due process.

445.    Defendants knowingly disregarded a substantial and real risk of serious injury, resulting in the deprivation of Zisa's life, liberty, and property interests.

446.    Zisa's rights to substantive due process under the Fifth and Fourteenth Amendments were clearly established such that any reasonable person would be aware of them. It was not reasonable for Defendants to believe that their actions and omissions did not violate Zisa's rights to substantive due process under the Fifth and Fourteenth Amendments.

447.    As a direct result of Defendants' violation of Zisa's constitutional rights, Zisa has suffered loss of liberty, damage to his reputation, mental anguish, emotional distress, embarrassment, humiliation and financial loss; all in extraordinary amounts, and is entitled to relief under 42 U.S.C. § 1983.

448.     Defendants acted maliciously, willfully, and wantonly in violating Zisa's federally protected rights.

## COUNT XIII

**Violation of Civil Rights Pursuant to N.J.S.A. § 6:10-1 *et seq.***
**Deprivation of Substantive Due Process – All Defendants**

449.     Zisa hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

450.     Defendants at all times acted under color of state law, and were acting within the scope of their (its) reponsibilities.

451.     Defendants, in their individual and official capacities, acting alone and in concert, engaged in conduct that shocks the conscience and deprived Zisa of interests protected by the New Jersey Constitution, resulting in the violation of Zisa's rights to substantive due process.

452.     Defendants knowingly disregarded a substantial and real risk of serious injury, resulting in the deprivation of Zisa's life, liberty, and property interests.

453.     Zisa's right to substantive due process under the New Jersey Constitution was clearly established such that any reasonable person would be aware of them. It was not reasonable for Defendants to believe that their actions and omissions did not violate Zisa's right to substantive due process under the New Jersey Constitution.

454.     As a direct result of Defendants' violation of Zisa's rights, Zisa has suffered loss of liberty, damage to his reputation, mental anguish, emotional distress, embarrassment, humiliation and financial loss; all in extraordinary amounts, and is entitled to relief under N.J.S.A. § 10:6-2.

455.     Defendants acted maliciously, willfully, and wantonly in violating Zisa's rights.

## COUNT XIV

**Violation of Civil Rights Pursuant to 42 U.S.C. § 1983
"Class of One" Selective Enforcement/Prosecution (Equal Protection Clause, 14th
Amendment) – All Defendants**

456.    Zisa hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

457.    Defendants at all times acted under color of state law.

458.    Defendants, in their individual and official capacities, acting alone and in concert, engaged in conduct that deprived Zisa of his right to equal protection of the laws under the Fourteenth Amendment.

459.    Persons similarly situated and alike in all relevant aspects to Zisa were not prosecuted or charged.

460.    The decision to charge and prosecute Zisa was made on the basis of an unjustifiable standard and arbitrary factors.

461.    Defendants intentionally treated Zisa differently from others similarly situated and alike in all relevant aspects.

462.    There is no rational basis for the difference in Defendants' treatment of Zisa and their treatment of Campos, Ferraioli, Al Ayoubi, Herrmann, and others.

463.    Defendants' selective treatment of Zisa was motivated by an intent to discriminate on the basis of impermissible considerations, to punish or inhibit the exercise of Zisa's constitutional rights, and by a malicious or bad faith intent to injure Zisa.

464.    Zisa's right to equal protection of the laws under the Fourteenth Amendment was clearly established such that any reasonable person would be aware of it. It was not reasonable for

Defendants to believe that their actions and omissions did not violate Zisa's right to equal protection of the laws under the Fourteenth Amendment.

465.    As a direct result of Defendants' violation of Zisa's constitutional rights, Zisa suffered loss of liberty, damage to his reputation, mental anguish, emotional distress, embarrassment, humiliation and financial loss; all in extraordinary amounts, and is entitled to relief under 42 U.S.C. § 1983.

466.    Defendants acted maliciously, willfully, and wantonly in violating Zisa's federally protected rights.

### COUNT XV

**Violation of Civil Rights Pursuant to N.J.S.A. § 6:10-1 *et seq.*
"Class of One" Selective Enforcement/Prosecution – All Defendants**

467.    Zisa hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

468.    Defendants at all times acted under color of state law, and were acting within the scope of their/its responsibilities.

469.    Defendants, in their individual and official capacities, acting alone and in concert, engaged in conduct that deprived Zisa of his right to equal protection of the laws under the New Jersey Constitution.

470.    Persons similarly situated and alike in all relevant aspects to Zisa were not prosecuted or charged.

471.    The decision to charge and prosecute Zisa was made on the basis of an unjustifiable standard and arbitrary factors.

472.    Defendants intentionally treated Zisa differently from others similarly situated and alike in all relevant aspects.

473.    There is no rational basis for the difference in Defendants' treatment of Zisa and their treatment of Campos, Ferraioli, Al Ayoubi, Herrmann, and others.

474.    Defendants' selective treatment of Zisa was motivated by an intent to discriminate on the basis of impermissible considerations, to punish or inhibit the exercise of Zisa's constitutional rights, and by a malicious or bad faith intent to injure Zisa.

475.    Zisa's right to equal protection of the laws under the New Jersey Constitution was clearly established such that any reasonable person would be aware of it. It was not reasonable for Defendants to believe that their actions and omissions did not violate Zisa's right to equal protection of the laws under the New Jersey Constitution.

476.    As a direct result of Defendants' violation of Zisa's rights, Zisa suffered loss of liberty, damage to his reputation, mental anguish, emotional distress, embarrassment, humiliation and financial loss; all in extraordinary amounts, and is entitled to relief under N.J.S.A. § 10:6-2.

477.    Defendants acted maliciously, willfully, and wantonly in violating Zisa's rights.

## COUNT XVI

### Violation of Civil Rights Pursuant to 42 U.S.C. § 1983
### Conspiracy - Defendants Haviland, Condon, Molina, Campos, Herrmann, Al-Ayoubi, Ferraioli, Arosemowicz, Lo Iacono,  Padilla, and the BCPO

478.    Zisa hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

479.    Defendants at all times acted under color of state law.

480.    Defendants, Haviland, Condon, Molina, Campos, Herrmann, Al-Ayoubi, Ferraioli, Arosemowicz, Lo Iacono,  Padilla (in their individual and official capacities) and the BCPO, conspired and agreed to engage in conduct that deprived Zisa of his rights under the Fourth, Fifth,

Sixth, and Fourteenth Amendments.  Defendants each engaged in a series of actions and omissions in furtherance of this conspiracy and agreement.

481.    Zisa's rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments were clearly established such that any reasonable person would be aware of them.  It was not reasonable for Defendants to believe that their actions and omissions did not violate Zisa's rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments.

482.    As a direct result of Haviland, Condon, Molina, Campos, Herrmann, Al-Ayoubi, Ferraioli, Arosemowicz, Lo Iacono,  Padilla, and the BCPO's violation of Zisa's constitutional rights, Zisa suffered loss of liberty, damage to his reputation, mental anguish, emotional distress, embarrassment, humiliation and financial loss; all in extraordinary amounts, and is entitled to relief under 42 U.S.C. § 1983.

483.    Defendants acted maliciously, willfully, and wantonly in violating Zisa's federally protected rights.

<u>**COUNT XVII**</u>

**Violation of Civil Rights Pursuant to N.J.S.A. § 6:10-1 *et seq.***
**Conspiracy - Defendants Haviland, Condon, Molina, Campos, Herrmann, Al-Ayoubi,**
**Ferraioli, Arosemowicz, Lo Iacono, Padilla, and the BCPO**

484.    Zisa hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

485.    Haviland, Condon, Molina, Campos, Herrmann, Al-Ayoubi, Ferraioli, Arosemowicz, Lo Iacono, Padilla, and the BCPO at all times acted under color of state law, and were acting within the scope of their/its responsibilities.

486.    Haviland, Condon, Molina, Campos, Herrmann, Al-Ayoubi, Ferraioli, Arosemowicz, Lo Iacono, Padilla (in their individual and official capacities), and the BCPO,

conspired and agreed to engage in conduct that deprived Zisa of his rights under the New Jersey Constitution.  Defendants each engaged in a series of actions and omissions in furtherance of this conspiracy and agreement.

487.    Zisa's rights under the New Jersey Constitution were clearly established such that any reasonable person would be aware of them.  It was not reasonable for Defendants to believe that their actions and omissions did not violate Zisa's rights under the New Jersey Constitution.

488.    As a direct result of Defendants' violation of Zisa's rights, Zisa suffered loss of liberty, damage to his reputation, mental anguish, emotional distress, embarrassment, humiliation and financial loss; all in extraordinary amounts, and is entitled to relief under N.J.S.A. § 10:6-2.

489.    Defendants acted maliciously, willfully, and wantonly in violating Zisa's rights.

## COUNT XVIII

### Common Law Conspiracy - Defendants Haviland, Condon, Molina, Campos, Herrmann, Al-Ayoubi, Ferraioli, Arosemowicz, Lo Iacono, Padilla, and the BCPO

490.    Zisa hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

491.    Defendants Haviland, Condon, Molina, Campos, Herrmann, Al-Ayoubi, Ferraioli, Arosemowicz, Lo Iacono, Padilla, and the BCPO at all times acted under color of state law.

492.    Defendants Haviland, Condon, Molina, Campos, Herrmann, Al-Ayoubi, Ferraioli, Arosemowicz, Lo Iacono, Padilla (in their individual and official capacities) and the BCPO, conspired and agreed to engage in conduct that injured Zisa.  Defendants each engaged in a series of wrongful actions and omissions in furtherance of this conspiracy and agreement.

493.    Zisa's rights under New Jersey common law were clearly established such that any reasonable person would be aware of them.  It was not reasonable for Defendants to believe that their actions and omissions did not violate Zisa's rights under New Jersey common law.

494.     As a direct result of Defendants' violation of Zisa's rights, Zisa suffered loss of liberty, damage to his reputation, mental anguish, emotional distress, embarrassment, humiliation and financial loss; all in extraordinary amounts, and is entitled to relief under New Jersey common law.

495.     Defendants acted maliciously, willfully, and wantonly in violating Zisa's rights.

## COUNT XIX

**Violation of Civil Rights Pursuant to 42 U.S.C. § 1983**
**Municipal Liability - Defendants City of Hackensack, County of Bergen, and the Bergen County Prosecutor's Office**

496.     Zisa hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

497.     City of Hackensack, County of Bergen, and the Bergen County Prosecutor's Office at all times acted under color of state law.

498.     The City of Hackensack, the County of Bergen, and the BCPO engaged in conduct that deprived Zisa of his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments.

499.     The County of Bergen employed Arosemowicz and had a duty to supervise and train him.

500.     The City of Hackensack employed Al-Ayoubi, Herrmann, Ferraioli, Campos, Lo Iacono, and Padilla, and had a duty to supervise and train them.

501.     LoIacono, as the Manager of the City of Hackensack, was the City administrator charged with supervising the HPD.

502.     The City of Hackensack and Lo Iacono entered into a Memorandum of Understanding with the BCPO, officially permitting the BCPO, and specifically, Condon and Haviland, to have and abuse powers which should have been guarded by the City of Hackensack.

503.     The BCPO expressly stated that the reasons for entering into the Memorandum of Understanding were administrative in nature and not related to any criminal investigation or prosecution.

504.     The City of Hackensack and BCPO's decision to enter into the Memorandum of Understanding further enabled the conspiracy that led to Zisa's convictions.

505.     The BCPO took over the administrative functions of the HPD, including but not limited to the HPD's Internal Affairs Unit, via the MOU between the City of Hackensack, and did so as part of, and in furtherance of, *inter alia*, the illegal immunity deals entered into with Al-Ayoubi, Herrmann, and Campos, for the protection and benefit of Al-Ayoubi, Herrmann, and Campos in regard to administrative charges, and to facilitate the BCPO to solicit false testimony against Zisa.

506.     The Memorandum of Understanding entered into by the City of Hackensack and the BCPO constituted a policy statement or decision that is officially made by the City of Hackensack and BCPO's policy-making officials.

507.     The conduct of Al-Ayoubi, Ferraioli, Herrmann, Campos, Padilla, and Lo Iacono in connection with the selective enforcement and prosecution against Zisa was made pursuant to a custom that is a widespread, well-settled practice that constitutes a standard operating procedure of the City of Hackensack and HPD to selectively enforce the law and prosecute individuals for personal or political reasons and in violation of the law.

508.     The actions and omissions of Al-Ayoubi, Ferraioli, Herrmann, Campos, Padilla, and Lo Iacono were mere implementations of City of Hackensack and HPD standard operating procedures.

509.   The Conduct of Al-Ayoubi, Ferraioli, Herrmann, Campos, Padilla, Lo Iacono, and Arosemowicz was the result of inadequate supervision. At all relevant times, the City of Hackensack, HPD, and County of Bergen were aware of but deliberately indifferent to the fact that violations of rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments are highly predictable consequences of the inadequate supervision,.

510.   Zisa's constitutional rights were clearly established such that any reasonable person would be aware of them. It was not reasonable for Defendants to believe that their actions and omissions did not violate Zisa's constitutional rights.

511.   As a direct result of Defendants' violation of Zisa's constitutional rights, Zisa suffered loss of liberty, damage to his reputation, mental anguish, emotional distress, embarrassment, humiliation and financial loss; all in extraordinary amounts, and is entitled to relief under 42 U.S.C. § 1983.

512.   Defendants acted maliciously, willfully, and wantonly in violating Zisa's federally protected rights.

## COUNT XX

**Violation of Civil Rights Pursuant to N.J.S.A. § 6:10-1 *et seq.***
**Municipal Liability - Defendants City of Hackensack, County of Bergen, and the Bergen County Prosecutor's Office**

513.   Zisa hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

514.   Defendants at all times acted under color of state law.

515.   The City of Hackensack, the County of Bergen, and the BCPO engaged in conduct that deprived Zisa of his rights under the New Jersey Constitution.

516.    The County of Bergen employed Arosemowicz and had a duty to supervise and train him.

517.    The City of Hackensack employed Al-Ayoubi, Herrmann, Ferraioli, Campos, Lo Iacono, and Padilla, and had a duty to supervise and train them.

518.    Lo Iacono, as the Manager of the City of Hackensack, was the City administrator charged with supervising the HPD.

519.    The City of Hackensack and the BCPO entered into a Memorandum of Understanding with the BCPO, officially permitting the BCPO, and specifically, Condon and Haviland, to have and abuse powers which should have been guarded by the City of Hackensack.

520.    The BCPO took over the administrative functions of the HPD, including but not limited to the HPD's Internal Affairs Unit, via the MOU between the City of Hackensack, and did so as part of, and in furtherance of, *inter alia*, the illegal immunity deals entered into with Al-Ayoubi, Herrmann, and Campos, for the protection and benefit of Al-Ayoubi, Herrmann, and Campos, in regard to administrative charges, and to facilitate the BCPO to solicit false testimony against Zisa.

521.    The BCPO expressly stated that the reasons for entering into the Memorandum of Understanding were administrative in nature and not related to any criminal investigation or prosecution.

522.    The City of Hackensack and BCPO's decision to enter into the Memorandum of Understanding further enabled the conspiracy that led to Zisa's convictions.

523.    The Memorandum of Understanding entered into by the City of Hackensack and Lo Iacono constituted a policy statement or decision that is officially made by the City of Hackensack and BCPO's policy-making officials.

524.     The conduct of Al-Ayoubi, Ferraioli, Herrmann, Campos, Padilla, and Lo Iacono in connection with the selective enforcement and prosecution against Zisa was made pursuant to a custom that is a widespread, well-settled practice that constitutes a standard operating procedure of the City of Hackensack and HPD to selectively enforce the law and prosecute individuals for personal or political reasons and in violation of the law.

525.     The actions and omissions of Al-Ayoubi, Ferraioli, Herrmann, Campos, Padilla, and Lo Iacono were mere implementations of City of Hackensack and HPD standard operating procedures.

526.     The Conduct of Al-Ayoubi, Ferraioli, Herrmann, Campos, Padilla, Lo Iacono, and Arosemowicz was the result of inadequate supervision. At all relevant times, the City of Hackensack, HPD, and County of Bergen were aware of but deliberately indifferent to the fact that violations of rights under the New Jersey Constitution are highly predictable consequences of the inadequate supervision.

527.     Zisa's rights under the New Jersey Constitution were clearly established such that any reasonable person would be aware of them. It was not reasonable for Defendants to believe that their actions and omissions did not violate Zisa's rights under the New Jersey Constitution.

528.     As a direct result of Defendants' violation of Zisa's constitutional rights, Zisa suffered loss of liberty, damage to his reputation, mental anguish, emotional distress, embarrassment, humiliation and financial loss; all in extraordinary amounts, and is entitled to relief under N.J.S.A. § 10:6-2.

529.     Defendants acted maliciously, willfully, and wantonly in violating Zisa's rights.

## COUNT XXI

**Common Law Aiding and Abetting - Defendants Al-Ayoubi, Herrmann, Campos, Arosemowicz, Condon, Molina, LoIacano, Padilla, Ferraioli, and Haviland**

530.    Zisa hereby incorporates all of the preceding allegations and makes them a part of this Count as if fully set forth herein.

531.    Defendants deprived Zisa of his rights guaranteed by New Jersey common law, the United States Constitution, 42 U.S.C. § 1983, the New Jersey Constitution, and N.J.S.A. § 10:6-1 *et seq*.

532.    Al-Ayoubi, Herrmann, Campos, Arosemowicz, Condon, Molina, LoIacano, Padilla, Ferraioli, and Haviland aided others whom performed wrongful acts that caused violations of Zisa's rights.

533.    Al-Ayoubi, Herrmann, Campos, Arosemowicz, Condon, Molina, LoIacano, Padilla, Ferraioli, and Haviland were at all times aware of their roles as part of overall illegal and tortious activity.

534.    Al-Ayoubi, Herrmann, Campos, Arosemowicz, Condon, Molina, LoIacano, Padilla, Ferraioli, and Haviland knowingly and substantially assisted the principal violations.

535.    Zisa's common law and constitutional rights were clearly established such that any reasonable person would be aware of them. It was not reasonable for Defendants to believe that their actions and omissions did not violate Zisa's common law and constitutional rights.

536.    As a direct result of Defendants' violation of Zisa's rights, Zisa suffered loss of liberty, damage to his reputation, mental anguish, emotional distress, embarrassment, humiliation and financial loss; all in extraordinary amounts, and is entitled to relief New Jersey common law.

537.    Al-Ayoubi, Herrmann, Campos, Arosemowicz, Condon, Molina, LoIacano, Padilla, Ferraioli, and Haviland acted maliciously, willfully, and wantonly in violating Zisa's rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Zisa demands judgment against Defendants as follows:

(a)      Awarding Zisa compensatory damages for loss of liberty, damage to his reputation (beginning from the above described investigation through the time of his arrest, indictment, conviction, through to today, and continuing into the future), mental anguish, emotional distress, physical injury, embarrassment, humiliation and financial loss in an amount to be deemed appropriate by a jury.

(b)      Awarding Zisa punitive damages, to the extent permitted by law, sufficient not only to punish Defendants for their egregious unconstitutional conduct but also to deter them from engaging in future acts of unconstitutional behavior against other citizens.

(c)      Awarding Zisa attorney's fees already incurred as a result of Defendants' unlawful conduct and any reasonable attorney's fees and costs incurred pursuant to 42 U.S.C. § 1988, and to the fullest extent permissible under the laws of the State of New Jersey, and the New Jersey Constitution.

(d)      Awarding Zisa pre-judgment and post-judgment interest.

(e)      Awarding Zisa all other relief that he may be entitled to under the law and all other relief that the Court deems just and proper.

## <u>JURY TRIAL DEMANDED</u>

Zisa demands a trial by jury on all issues so triable.


Dated: July 28, 2017

                                      **MCCUSKER, ANSELMI, ROSEN**
                                       **& CARVELLI, P.C.**


                         By:     <u>*/s/ Patricia Prezioso*</u>
                               Patricia Prezioso, Esq.
                               210 Park Avenue, Suite 301
                               Florham Park, New Jersey 07932
                               Tel: (973) 635-6300
                               Fax: (973) 635-6363

## <u>CERTIFICATION PURSUANT TO LOCAL RULE 11.2</u>

I certify that the matter in controversy is not the subject of any other action pending in any

court, or of any pending arbitration or administrative proceeding.

Dated: July 28, 2017

                              **MCCUSKER, ANSELMI, ROSEN**
                                **& CARVELLI, P.C.**

By:    */s/ Patricia Prezioso*
            Patricia Prezioso, Esq.
            210 Park Avenue, Suite 301
            Florham Park, New Jersey 07932
            Tel: (973) 635-6300
            Fax: (973) 635-6363